951 F.2d 1258
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 AIRCRAFT SALES OF CALIFORNIA, INC., Plaintiff-Appellant,
v.
INSURED AIRCRAFT TITLE SERVICE, INC.; Chase Manhattan Bank,
N.A., Defendant-Third-Party-Plaintiff,
v.
NIGERIAN AIR SERVICES, LTD., Third-Party-Defendant-Appellee.
 No. 90-6125.
 United States Court of Appeals, Tenth Circuit.
 Dec. 18, 1991.
 
 1
 Before JOHN P. MOORE and EBEL, Circuit Judges, and BROWN,* District Judge.
 
 ORDER AND JUDGMENT
 
 2
 WESLEY E. BROWN, Senior District Judge.
 
 
 3
 This action involves the right to the proceeds of a $300,000 escrow account deposited with the defendant Insured Aircraft Title Service, Inc., by the defendant-appellee, Nigeria Air Services, Ltd, in connection with negotiations between Nigeria Air and the plaintiff-appellant Aircraft Sales, for the lease or purchase of aircraft. Aircraft Sales appeals the district court's entry of summary judgment in favor of Nigerian Air following a finding that Aircraft Sales had failed to establish the existence of any binding contract between the parties. Appellant claims here that the district court erroneously granted summary judgment since disputed issues of material fact prevented a summary disposition of the case.
 
 
 4
 The litigation began when Aircraft Sales filed its petition against the escrow agent, Insured Aircraft, in state court to recover the $300,000 deposited by Nigerian Airways. Insured Aircraft answered, filed a counterclaim, and a third-party petition against Nigerian Airways, and Chase Manhattan Bank. The case was removed to federal court, where Nigerian Airways filed a counterclaim against Insured Aircraft for recovery of the $300,000 which it had deposited.[1] The Chase Manhattan Bank disclaimed any interest in the funds and was dismissed. The escrow fund was deposited into court and Insured Aircraft was dismissed from the case. In order to avoid confusion in discussing the issues, Aircraft Sales may hereafter be referred to as "plaintiff," and Nigerian Airways may be referred to as "defendant," or "Nigerian."
 
 
 5
 The facts giving rise to this case as recited by the district court (Vol. II Record, Dkt. 31) may be stated in this manner:
 
 
 6
 In March, 1986, plaintiff and defendant entered into negotiations for the sale or lease of commercial passenger airplanes. On March 24, 1986, defendant, through its attorney-agent, established an escrow account of $300,000 with the Insured Aircraft Title Service, Inc. (Title Service), an Oklahoma City firm, the third-party plaintiff in this action.
 
 
 7
 The transmittal letter setting up this account[2] provided that the escrow deposit of $300,000 represented "the deposit of $100,000 for each of three used 737-200 aircraft." The transmittal letter also provided that:
 
 
 8
 "Until otherwise advised to you by Nigeria Airways or Mrs. Ruth Weinstein or the undersigned of this office (Attorney Donald A. Wassall), the deposit for each aircraft is refundable and you shall if requested return the same to Nigeria Airways." (Emphasis supplied). Confirmation of the receipt of the funds was to be made to Cohuay S.A., Buenos Aires, Argentina, to the attention of Luis F. Colombo, President. Plaintiff was not a party to this escrow agreement, and it claims that it was not informed of its terms.
 
 
 9
 Negotiations between the parties were undertaken by Donald Pritchard, president of Aircraft Sales, and Chief Louis Ogbogu, the agent for Nigerian Airways. The two communicated by telegram on several occasions in March, April and May, 1986 concerning a possible purchase or lease of one or more aircraft by Nigerian.
 
 
 10
 Plaintiff contends that in March, 1986, Ogbogu orally contracted for the purchase of one used Boeing 737/200 plane, serial No. 20205 for a price of $10,800,000. This plane was to be purchased by another firm, Skyline Company,[3] from Pan Am Airlines and resold to defendant with plaintiff acting as the broker. In this respect, plaintiff now claims that it had a "brokerage" contract with defendant, that the $300,000 escrow was set up for the benefit of plaintiff, and that the money was not refundable to defendant after the airplane was "made available" for Nigerian inspection. Plaintiff asserts that the plane was made available, that defendant failed to inspect it, and thus it is entitled to the escrow.
 
 
 11
 Nigerian denies that it ever entered into a purchase, lease, or escrow contract with plaintiff, and that it is entitled to return of the deposit under the terms of its agreement with Insured Aircraft.
 
 
 12
 In this case, plaintiff first relied upon an alleged oral contract of sale, contending that the $300,000 represented a down payment on the contract. Thus in its petition, filed March 6, 1989, Document I, Paragraph 2, plaintiff alleged that:
 
 
 13
 2. On or about April 1986, Nigerian Airlines, Aircraft Sales of California, Inc. ... and Insured Aircraft Title Service, Inc. .. entered into an escrow contract. Under the terms of this contract, Insured Aircraft was to hold in escrow $300,000 which it had received from Nigerian Airlines. The $300,000 placed in escrow represented a down payment by Nigerian Airlines for the purchase of an aircraft from Aircraft Sales. This $300,000 deposit was non-refundable to Nigerian Airlines, if and when Aircraft Sales made the subject aircraft available for inspection. The terms and conditions of the sale contract between Nigerian Airlines and Aircraft Sales were made known to Insured Aircraft.
 
 
 14
 (Emphasis supplied).
 
 
 15
 The allegations in the petition were, of course, contrary to the terms of the written escrow agreement between Nigerian and Insured Aircraft Title Service.
 
 
 16
 Defendant moved for summary judgment alleging that the Uniform Commercial Code Statute of Frauds barred plaintiff's claim, so that plaintiff had no right to the fund because there was no enforceable lease or escrow agreement. In response, plaintiff filed an affidavit from Pritchard, changing ground and claiming that the Statute of Frauds did not apply to "the brokerage contract " between the parties, and that even if it did apply, defendant had partially performed the contract by depositing the escrow account.
 
 
 17
 The affidavit of Donald Pritchard, filed on January 29, 1990, in response to the motion for summary judgment, provided this information for the court: (Vol. I Record, Exhibit A to Document 26).
 
 
 18
 2. In February of 1986, I was contacted by representatives of Nigerian Air Services, Ltd. ... who indicated that Nigerian Air wanted to purchase an airplane for their commercial fleet.
 
 
 19
 3. I subsequently communicated with and arranged the purchase of one airplane by Chief Louis Ogbogu, agent of Nigerian Air, from Skyline, a Norwegian Company.
 
 
 20
 4. In March of 1986 I brokered a contract between Chief Louis Ogbogu on behalf of Nigerian Air and Skyline for the purchase of one used 737/200 airplane, serial number 20205 for a price of $10,800,000.00. Under the terms of the contract Nigerian Airways was to put up a $300,000 deposit for the benefit of Aircraft Sales of California ... which was refundable until the airplane was made available for inspection. Under the terms of the contract, the airplane was to be made available for inspection in London, England or Germany. If the airplane was made available for inspection and the buyer failed to inspect the airplane, then the $300,000 deposit was non-refundable and payable to Aircraft Sales of California, Inc. (Emphasis supplied).
 
 
 21
 The District court granted defendant's motion for summary judgment, finding that the parties own course of conduct negated any inference that there was any contract; that there was a complete absence of any written confirmation of a contract; that there was no evidence of a sales or brokerage contract involving Skyline, and that there was no evidence of any breach of an escrow agreement.
 
 
 22
 In this appeal, plaintiff contends that the district court erroneously granted summary judgment in favor of defendant by deciding genuine issues of material fact.
 
 
 23
 The standards for entry of summary judgment, and the review of that judgment by this court, were fully examined in Carey v. U.S. Postal Service, 812 F.2d, 621, 623 (10th Cir.1987). As there noted, summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 24
 "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L.Ed.2d 202 at 211 (1986). (Emphasis of the court).
 
 
 25
 "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id.
 
 
 26
 The disputed factual issues must be relevant and necessary to resolve the issues. The factual dispute must be genuine in nature, so that the party opposing summary judgment must point to evidence, which if believed by a jury, would result in a verdict for that party.
 
 
 27
 Rule 56(e) Fed.R.Civ.Proc. provides in part that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of (his pleading)"--he "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered...."
 
 
 28
 The appeal of an order granting summary judgment is reviewed de novo, applying the same standard used by the district court. William C. Renfro v. City of Emporia, Kansas, --- F.2d ---- (10th Cir. Nov. 15, 1991); Osgood v. State Farm Mut. Auto. Ins. Co., 848 F.2d 141, 143 (10th Cir.1988).
 
 
 29
 The issues presented for appeal in this case are first, whether any contract at all existed between defendant and plaintiff pertaining to the sale or brokerage of aircraft; and second, whether enforcement of an alleged oral contract between the two is barred by the statute of frauds.
 
 
 30
 The district court found that plaintiff failed to meet its burden of showing a genuine issue of fact which would require trial of the issues. The court found that the parties' course of conduct negated any inference that a sales contract was made, since only one of the eight telegrams exchanged even mentioned a sale of aircraft to Nigerian, and since the parties communicated by telegram about the lease, it would be expected that some mention would have been made of a pending sale. In addition, the court found that the absence of any written confirmation of the alleged oral sale contract indicated that no sale agreement was ever made. As the court noted, this "is not the way such business transactions are typically conducted." Such finding is entirely supported by the content of telegrams exchanged between the parties, referring to lease of aircraft, since reference is frequently made of the preparation of written lease agreements. If there had in fact been a sales agreement, one would certainly expect to find references to a similar written understanding. It is also significant that there was no evidence that Skyline or any one else had a contract to deliver an airplane for sale to Nigerian, and plaintiff failed to bring forth any evidence that Skyline ever asserted a claim against Nigerian for breach of any contract.
 
 
 31
 In its argument to this court, plaintiff now asserts that there are two separate contracts involved in this litigation and that the district court erred by failing to analyze the contracts separately. The claim is made that the "first contract" is a brokerage contract between plaintiff and defendant, whereby plaintiff just agreed to "find" an airplane for sale and to make it available for inspection, so that plaintiff is entitled to the escrow fund regardless of whether there was an actual sale. According to plaintiff, the "second contract" was one between Nigerian Airways and Skyline for the sale of an aircraft, and it is claimed that this second contract had "nothing to do with the validity" of plaintiff's contract to provide brokerage service to Nigerian Airways for a fee. The argument is made that the district court completely ignored the sworn affidavit of Pritchard which established the brokerage contract.
 
 
 32
 As noted by defendant, a party may not resist summary judgment by means of a "sham" affidavit and arguments in an attempt to rewrite the facts at issue. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Perma Research and Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir.1969). In Van T. Junkins and Associates v. U.S. Industries, 736 F.2d 656 (11th Cir.1984) the court recognized that an affidavit may be disregarded when it contradicts clear answers previously given in deposition testimony. Cf. Tippens v. Celotex Corp., 805 F.2d 949 (11th Cir.1986) rehearing denied, 815 F.2d 66 (11th Cir.1987). In Franks v. Nimmo, 796 F.2d 1230 (10th Cir.1986) this circuit followed the Perma Research and Van Junkins cases in recognizing that a court may disregard an affidavit which is contrary to previously sworn testimony when the court determines that the affidavit seeks to create "sham issues." Inquiry into the weight of such an affidavit depends on various factors--such as "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony, or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." 796 F.2d at 1237. In the Franks case, which rejected the affidavit, we noted that the affiant had been carefully cross-examined when he gave earlier testimony, his new affidavit made no reference to his prior testimony, and that the affidavit was offered only after summary judgment had been granted against him.
 
 
 33
 A similar situation is presented here. As previously noted, plaintiff's petition alleged that the $300,000 was a down payment by defendant on the purchase of an aircraft from plaintiff, and that the "terms and conditions of the sale contract between Nigerian Airlines and Aircraft Sales were made known to Insured Aircraft." (Emphasis supplied.)
 
 
 34
 In his deposition taken on December 13, 1989, (Record, Vol. I, Ex. B, Item 26, and Vol. II Record, Appendix), Pritchard testified that he was putting a deal together for Skyline:
 
 
 35
 Q. Was Aircraft Sales intending to purchase the aircraft?
 
 
 36
 A. One of our representatives was.
 
 
 37
 Q. Was Aircraft Sales acting as the broker for this aircraft, for the sale of the aircraft?
 
 
 38
 A. We were working--yes, percentage basis, right.
 
 
 39
 Q. What I'm asking is whether at the end of the day Aircraft Sales was going to be the owner of this aircraft or whether Aircraft Sales was acting on a commission basis to find an owner and to accomplish a sales transaction.
 
 
 40
 A. We were putting the deal together for an investment company.
 
 
 41
 Q. Could you tell me on whose behalf you were acting with respect to this?
 
 
 42
 A. Yes, a company called Skyline in Norway, actually a holding company. (Emphasis supplied).
 
 
 43
 He testified that the purpose of the negotiations was to conduct a sale:
 
 
 44
 Q. ... Do you know who the seller of the aircraft was?
 
 
 45
 A. Of course, we were the one that was putting it together, both sides.
 
 
 46
 Q. Who was the seller?
 
 
 47
 A. We had three different ones. On that airplane, I believe it was Pan Am on that airplane.
 
 
 48
 Q. Had the parties come to an agreement with respect to a sales contract as of April 21, 1986?
 
 
 49
 A. It's in the telexes, the dates that we came to agreement; and I don't remember. (Vol. I Exhibit Item 26, pp. 18-19).
 
 
 50
 While Pritchard testified as to the existence of a sale contract, he was unable to give a date when the agreement was made. He stated that the date would appear in his notebook, but that notebook was not submitted to the district court. He did not remember the exact price of the aircraft; "it was probably somewhere in the neighborhood of--I don't know, seven, eight, twelve million dollars, somewhere in that neighborhood." (Deposition, p. 34). He did not know the serial number of the aircraft, but stated that he could "probably come up with it." (Deposition, pp. 34-35). He did not remember the delivery date. He explained the purpose of the $300,000 in escrow in this manner:
 
 
 51
 They put down $300,000, nonrefundable program (sic). That was to purchase an aircraft. We were working all kinds of programs with them for different kinds of airplanes for different provisions. 300,000 nonrefundable was to buy an airplane.
 
 
 52
 Q. At what point in time was a decision made to concentrate on the leasing of an aircraft?
 
 
 53
 A. When they didn't show up to make a prepurchase inspection to inspect the aircraft that we had agreed to sell them. (Deposition p. 39)
 
 
 54
 Pritchard recalled that negotiations continued "back and forth" until July, 1986, but he did not remember what they were and had no records on those. (Deposition p. 52). The parties never came to any agreement on the terms for the sale or lease of any aircraft, and apart from Pritchard's affidavit, there was certainly no showing of a separate "brokerage contract."
 
 
 55
 The district court correctly found that plaintiff had failed to establish that there was a genuine issue of material fact for trial, since plaintiff failed to establish that there was any binding contract between the parties. This conclusion is supported by evidence of the parties' own course of conduct which negated the existence of a sales contract since, during the exchange of eight telegrams, only one even mentioned a possible sale of aircraft to Nigerian. All other telegrams referred to lease of aircraft.
 
 
 56
 Thus, a telegram of March 25 (Ex. A, Vol. II Record) referred to "two brand new 747-300" aircraft, "delivery of first aircraft within two years from contract signing" (emphasis supplied), with possible 10-year financing, and a reference to an immediate long-term dry lease, minimum of 5 years, of two 747-200B aircraft, including spare parts and training for crews.
 
 
 57
 A telegram of April 21, 1986, contained these references concerning a telephone conversation of that date (Ex. B, Vol. II, Record):[4]
 
 
 58
 Aircraft Sales of Calif. Inc. is holding number 1 position on the purchase of the Boeing 737-200 ...
 
 
 59
 We are putting an enormous effort to make this aircraft available for inspection for Nigerian representative. We expect this to happen within the next ten (10) days.
 
 
 60
 Your lease payment for a two year lease on this aircraft will be two hundred thirty eight thousand U.S. dollars $238,000.00 per month.
 
 
 61
 Be assured we are using all our world wide resources and contacts to furnish this and other aircraft to fill the needs of Nigerian Airlines.
 
 
 62
 On April 30, Don Pritchard sent this message to Louis Ogbogu: (Ex. B, Vol II, Record)
 
 
 63
 The lease price on 737 that is currently under our negotiations in London will be $207,500.00 U.S.D. per month for a two years lease period.
 
 
 64
 Have been in touch with my financial advisors and they will not have actual lease contracts available to you in time for New York delivery. Will forward to London as soon as they are completed.
 
 
 65
 We are urgently looking for a 747-200B that we can lease for a good price.
 
 
 66
 By May 6, Louis Ogbogu was advised (Ex. B, Vol. II Record) that Aircraft Sales had for a two-year lease a 737-200, ready for delivery in September, 1986. Ogbogu was also advised that a "737-200-15 engines O.C." was available for delivery in August, 1987, with a two-year lease. Some of the "primary lease requirements" were a guarantee of the cost of the aircraft during the length of the lease, deposit of twelve monthly payments in advance; return of the aircraft in good condition and currently airworthy. This message concluded with the following advice:
 
 
 67
 When your customers are ready to do business on the above aircraft our attorneys will present formal contracts for your customers signatures and guarantees.
 
 
 68
 Telegrams of May 7 and 8 reveal continued disputes as to the price per month to lease rental aircraft, the extent of guarantees, the amount of deposits, and other terms. (Ex. B, Vol. II, Record)
 
 
 69
 On May 20, 1986, Ogbogu advised Pritchard that his clients had "decided to take" a B737-20015 on a two-year lease at a cost of $210,000. He also advised that they would "take one unit of B747-200 passenger for one-year at a monthly cost of 450,000.000 USD." Pritchard was requested to submit complete avionics, the date and place for inspection, and the contact person for inspection within ten days and, if Aircraft Sales failed to provide the information by May 28, the acceptance was void. In this telex, Ogbogu noted that "My clients have 3000,000.00 USD in escrow in New York bank for lease of said B737-200 aircrafts." (Emphasis supplied).
 
 
 70
 The course of dealing between plaintiff and Chief Ogbogu is clearly revealed in Pritchard's own words (Appendix, Vol. II, Record, pp. 30-31):
 
 
 71
 A. The Chief was a strange fellow. I'm going to make a couple of points here of the Chief. No matter what, he would come up with one ballgame one day. And as soon as that ballgame was met, he would change his ballgame and go to something else. And that was standard procedure with him.
 
 
 72
 Q. In fact, you said though that you were discussing a number of different aircraft at the time these telexes were going back and forth?
 
 
 73
 A. We were. But I'm saying he would set up one ballgame on one airplane; and as soon as that was close to being met, he'd say, "We can't do that. Let's do something different.
 
 
 74
 Gentlemen are gentlemen in Harvard Business, but he was very wishy-washy on all his dealings. I don't remember exactly how he responded to that, is what I'm saying, under those conditions.
 
 
 75
 We just told him what we had to have to make a deal. And no matter what it was, something had to be changed always, amount of money ...
 
 
 76
 * * *
 
 
 77
 * * *
 
 
 78
 Q. As of May 7, 1986, what specific terms of a lease agreement had been agreed upon as between you and Nigeria Airways with respect to either of these two aircraft?
 
 
 79
 * * *
 
 
 80
 * * *
 
 
 81
 A. Originally they agreed to purchase one of the airplanes, the first airplane. We made it available for inspection. They didn't show up to inspect it.
 
 
 82
 And they didn't put any agreement together at all after we had it available and ready. That's one agreement.
 
 
 83
 On the other ones here, we had talked numbers back and forth by with (sic) the Chief. And every time we met his requirements, he would change them.
 
 
 84
 In connection with its claim, plaintiff also alleges that defendant breached an oral escrow agreement since the establishment of a refundable escrow was contrary to the "real agreement" that the escrow deposit was to be paid directly to plaintiff and refundable only until an aircraft was made available for inspection. No such terms are mentioned in any of the telex messages and, as noted by the trial court, there is no indication in the telexes that plaintiff ever made any objection to defendant's failure to make an escrow deposit in accordance with the alleged agreement. There even appears to be an absence of agreement as to the purpose of the escrow--since defendant deposited $100,000 for each of three used 737-200 aircraft, while plaintiff now contends that the $300,000 deposit was for the purchase of one plane, or that the $300,000 was a brokerage fee for "finding" an aircraft. Plaintiff may not unilaterally amend the terms of a written escrow agreement, an agreement to which he was never a party.
 
 
 85
 Plaintiff argues that the escrow deposit was a down payment on the purchase price of the aircraft, and that this partial performance obviated the need for a written agreement thus taking the contract out of the State of Frauds. We agree with the trial court's conclusion:
 
 
 86
 Escrow deposits made in connection with the purchase of property, unlike partial payments, are commonly subject to refund to the prospective buyer if certain contingencies are not satisfied. The fact that Nigerian paid the deposit to a third party, rather than Plaintiff (Aircraft Sales), and reserved the right to withdraw the funds upon request does not show an admission of a contract or an intent to make a partial payment on a contract. If anything, it shows an intent by Nigerian not to be bound or committed to Plaintiff. (Vol. I Record, Item 34, p. 7)
 
 
 87
 We are satisfied that there was no genuine issue of material fact for trial in this case, that no enforceable contract was made between the parties, and that Nigerian was entitled to summary judgment as a matter of law.
 
 
 88
 The order entering summary judgment in facor of Nigerian is AFFIRMED.
 
 
 
 *
 Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The case was removed to federal court by Nigeria Airways, Ltd. because Nigeria Airways is an agency or instrumentality of a foreign state under 28 U.S.C. Section 1603(b)
 
 
 [2]
 The account was set up by the law offices of Winthrop, Stimson, Putnam & Roberts of New York, attorneys for Nigeria Airways, and the transmittal letter appears as Exhibit A, Vol. II of the Record
 
 
 [3]
 The Skyline Company is not a party to this action
 
 
 [4]
 This telegram was directed to Nigerian Airways, c/o Ron Greenwald, New York City, from Don Pritchard of Aircraft Sales