DUNKIN' DONUTS INCORPORATED

v.

Michael PANAGAKOS, et al.

Civil Action No. 96–11040–RGS.

United States District Court,
D. Massachusetts.

May 8, 1998.

Stephen Horn, Robert L. Zisk, Steven A. Browne, Robert A. Murphy, Joan M. Griffin, Casner & Edwards, Boston, MA, J. Thomas Esslinger, Jeremy M. Griffin, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, for Plaintiff.

Howard A. Brick, Mark J. Ventola, Renee Inomata, Burns & Levinson, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On May 21, 1996, Dunkin' Donuts, Inc., brought this action seeking judicial confirmation of its decision to revoke Michael Panagakos's five Dunkin' Donuts franchises. On May 13, 1997, the court granted Dunkin' Donuts' motion for declaratory judgment, agreeing that under the terms of the Master Franchise Agreement, Panagakos's 1994 convictions for failing to file corporate excise and meals tax returns for two of his Dunkin' Donuts' shops, provided justifiable grounds for termination. The court also rejected Panagakos's proposed finding that Dunkin' Donuts had waived its termination rights by delaying the revocations for eight months after his convictions.

On October 20, 1997, after the parties had completed additional discovery, Dunkin' Donuts filed this motion seeking to preclude a trial of Panagakos's waiver and estoppel defenses. Dunkin' Donuts has also moved for summary judgment on Panagakos's remaining counterclaims.[1] A hearing was held on the motion on April 15, 1998.[2]

### FACTS

In the light most favorable to Panagakos as the nonmoving party, the material facts are these. In 1992, Panagakos owned three Dunkin' Donuts shops (M & K Corp., 807 Corp., and 1014 Corp.) in New Bedford and Fairhaven, Massachusetts. On December 8, 1992, Panagakos was indicted by a state grand jury for seventy-seven counts of tax evasion. Panagakos informed Dunkin' Donuts of the indictment. He also insisted to Robert Gabellieri, his "primary representa-

---

1. Count III of the counterclaim has been voluntarily dismissed.

2. Among other arguments, Panagakos contends that because the court previously denied his motion for summary judgment, Dunkin' Donuts' counter-motion must also be denied. The argument misapprehends the difference in substance between the two motions. Panagakos's motion was based on the contention that Dunkin' Donuts had waived its termination rights because an official of the company had told him that the indictment would have no adverse impact on his status as a franchisee. The court determined that a dispute existed as to whether Dunkin' Donuts had *knowingly* waived its termination rights in light of Panagakos's misleading protestations of innocence. Dunkin' Donuts' present motion accepts as true the assertion that an employee promised Panagakos that the company would "stick" with him despite the indictment, but contends that notwithstanding that assurance, Panagakos cannot establish an *actual* or *effective* waiver on Dunkin' Donuts part.

tive" at Dunkin' Donuts, that he was not guilty of the charges. Dunkin' Donuts' management accepted Panagakos's claim of innocence. Gabellieri later told Panagakos that his franchises would be unaffected by the pending case.

In September of 1993, Panagakos opened a fourth Dunkin' Donuts franchise, DD94, in New Bedford. After the indictment, but well before his trial date, Panagakos submitted a Dunkin' Donuts Exclusive Development Plan (EDP) application seeking to expand his territorial license and build a fifth shop. On September 10, 1993, Dunkin' Donuts approved the EDP. In December of 1993, Dunkin' Donuts authorized Panagakos to begin construction of franchise NB18 in New Bedford.

On February 16, 1994, without notice to Dunkin' Donuts, Panagakos pled guilty to all seventy-seven counts of the indictment. He was sentenced to two years in jail, three years' probation, and 1,000 hours of community service.[3] That evening, Panagakos telephoned Gabellieri to tell him of the day's events. Gabellieri told Panagakos that Thomas Coba, Dunkin' Donuts' General Manager, had said that Dunkin' Donuts would "stick" with Panagakos notwithstanding the convictions.[4]

The following day, Coba recommended an audit of Panagakos's stores to determine whether he had been under-reporting his sales. He also informed Dunkin' Donuts' in-house counsel, Robert Sawyer, of Panagakos's guilty plea. The legal department directed Gabellieri to proceed with the audit.

Gabellieri asked Panagakos for a business plan for managing his shops while he was incarcerated. Panagakos designated two employees, Donna Wood and Jane Magan, to serve as interim managers. Neither Wood nor Magan was ever told by Dunkin' Donuts that Panagakos's franchises were in jeopardy. Dunkin' Donuts continued to accept Panagakos's franchise fees without comment or reservation of rights.

Dunkin' Donuts also permitted Panagakos to continue construction of the NB18 shop. On March 10, 1994, while Panagakos was in jail, Dunkin' Donuts approved a Franchise Agreement for the NB18 store. Panagakos does not dispute the testimony of Jack Laudermilk, Dunkin' Donuts' Senior Legal Counsel, that Dunkin' Donuts has a corporate policy permitting terminated franchisees to sell their stores as going concerns as a means of recouping their investment. Panagakos does, however, state that no one at Dunkin' Donuts ever discussed the policy with him or offered him the opportunity to convert the NB18 shop to some other use. From the time of his guilty plea to the opening of the NB18 shop in May of 1994, Panagakos incurred approximately $242,000 in construction and development costs.[5]

In June of 1994, Laudermilk asked outside counsel to investigate the termination of Pa-

---

3. Panagakos's statement of undisputed facts dwells at length on his pre-conviction dealings with Dunkin' Donuts. This evidence, even if accepted as true, has little if any bearing on the dispute before the court. For example, Panagakos complains that "[a]fter the indictment, [Dunkin' Donuts] officials told Panagakos that his relationship with Dunkin' would be 'business as usual.' No Dunkin' official ever told Panagakos that Dunkin' was only respecting a presumption of innocence and that his status as a franchisee might change in the event that he was convicted." Defendant's Memorandum, at 4. It is undisputed that Dunkin' Donuts' behavior towards Panagakos during this period was heavily influenced by his lies about his guilt.

4. Although not relevant for present purposes, both Gabellieri and Coba deny making the statements.

5. At the hearing, Panagakos argued that had he known that Dunkin' Donuts would eventually terminate the franchise, he might have redesigned the NB18 structure to accommodate some other franchise or he might have sold the property at a profit. Panagakos, however, has presented no evidence that either alternative was feasible; he merely states in his affidavit that he is "confident that [he] would have used the money for another purpose and completed the development of the site for another use." Panagakos Affidavit ¶ 7. More significantly, Panagakos has presented no evidence to dispute Dunkin' Donuts' contention that allowing Panagakos to complete the NB18 shop placed him in a better position than he would have been had construction of the shop been halted in February of 1994, because as an operating concern the shop is now valued at between $590,000 to $629,000, more than twice the amount of Panagakos's additional investment.

nagakos's franchises.[6] In June of 1994, Sawyer, the in-house counsel, notified Panagakos that Dunkin' Donuts considered him to be in violation of the Master Franchise Agreement because he was not complying with company procedures for reporting sales.[7] In July, Sawyer and Laudermilk wrote to inform Panagakos that he was improperly displaying signage at one of his stores. Neither letter mentioned the tax convictions.

In July of 1994, Panagakos wrote to Laudermilk, among others, discussing his guilty plea and explaining that "[i]n regard to the present situation I would like to present you with a brief synopsis of my personal history with Dunkin' Donuts." Panagakos then asked Dunkin' Donuts to "judge my character based upon the twenty-two years experience that the company has had with me." In his letter Panagakos did not mention the assurance that he had received from Gabellieri.

On August 11, 1994, Panagakos's commercial lender, Shawmut Bank, notified Panagakos that because of a default, payment of his loan was being accelerated. Shawmut also informed Laudermilk that it was calling the loan. The loan was secured by Panagakos's personal guarantee and by real estate owned by Panagakos, including some of the donut shop sites.[8]

On October 26, 1994, after Panagakos had completed his jail sentence, Dunkin' Donuts served termination notices for each of his franchises. On November 18, 1994, Panagakos sent a letter asking Dunkin' Donuts to "consider my plea to allow me to remain within the system." Panagakos repeated his extenuating explanation of his convictions, but again he did not allude to Gabellieri's assurance.

6. It is undisputed that Laudermilk was the only Dunkin' Donuts official with the actual authority to terminate a franchise.

7. Panagakos's procedural shortcomings were unrelated to his tax problems.

8. It is unclear from the pleadings whether Panagakos eventually paid off the loan or reached an accommodation with Shawmut. At oral argument, Panagakos offered no evidence that Dun-

## DISCUSSION

The court has already determined that Panagakos's convictions were "act[s] injurious or prejudicial to the goodwill associated with Dunkin' Donuts' Proprietary Marks and the Dunkin' Donuts System," justifying termination of the franchises. See Opinion of May 13, 1997, citing Master Franchise Agreement, ¶ 8(A)(1). The issue remaining is whether Panagakos has a valid waiver or estoppel defense.

### A. *Waiver*

█] Waiver entails a factual determination of whether Dunkin' Donuts relinquished or intended to relinquish its contractual rights under the Franchise Agreement. "[T]he Massachusetts standard for waiver is an uncompromising one. A finding of waiver must be premised upon 'clear, decisive, and *unequivocal* conduct on the part of an authorized representative ... indicating that [it] would not insist on adherence to the [agreement].'" *Paterson–Leitch Company, Inc. v. Massachusetts Electric*, 840 F.2d 985, 992 (1st Cir.1988), quoting *Glynn v. City of Gloucester*, 9 Mass.App.Ct. 454, 462, 401 N.E.2d 886 (1980) (emphasis in original). See also *Cashman v. City of Boston*, 190 Mass. 215, 218–219, 76 N.E. 671 (1906); *Millen v. Boston*, 217 Mass. 471, 472–473, 105 N.E. 453 (1914); *Lewis v. Commonwealth*, 332 Mass. 4, 6, 122 N.E.2d 888 (1954).

█ Whether or not a waiver has been effected is determined by an objective assessment of the conduct of the party asserted to have surrendered its contractual rights. It is not gauged by the subjective expectations of the party who could expect to benefit from the relinquishment. Thus, in the usual course, a jury would be asked to decide if Dunkin' Donuts had affirmatively waived its rights, or whether from its conduct an inten-

kin' Donuts' delay in terminating the franchises had any influence on Shawmut or, more significantly, that Dunkin' Donuts knowledge of Shawmut's action influenced the decision to delay. The court assumes that Panagakos is arguing that Dunkin' Donuts had a selfish motive for delaying the termination of the franchises that was in some fashion connected to the Shawmut loan. Panagakos, however, has presented no facts supporting such an inference.

tion to waive could be properly inferred. "[T]he burden of proving the waiver devolves upon the party asserting it." *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893 (1st Cir.1988).

■■ Panagakos argues that his perception of Dunkin' Donuts' conduct is relevant because he relied on that perception to his detriment. It is evident from the argument that Panagakos confuses waiver with estoppel. "A successful assertion of equitable estoppel requires: (1) '[a] representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made[;] (2)[a]n actual act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made[;] (3)[and] detriment to such person as a consequence of the act or omission.'" *Boylston Development Group, Inc. v. 22 Boylston St. Corp.*, 412 Mass. 531, 542, 591 N.E.2d 157 (1992), quoting *Cellucci v. Sun Oil Co.*, 2 Mass.App.Ct. 722, 728, 320 N.E.2d 919 (1974).[9]

■■ The difference between the two defenses is important. Estoppel is the more powerful in a particularly pertinent sense. While waiver is determined by a party's actual intent with respect to its contractual rights, estoppel, as an instrument of equity, has the power to extinguish a party's contractual rights even absent evidence of a waiver, so long as the party's conduct was sufficiently misleading to cause detrimental reliance by a third party. The familiar simile of sword and shield is an apt description of the distinction.

■■ Panagakos argues that an intent on Dunkin' Donuts' part to waive its termination rights can be inferred from the following: (1) Dunkin' Donuts allowed Panagakos to complete and open the NB18 shop under a Franchise Agreement even after it became aware of his convictions; (2) Dunkin' Donuts never told Panagakos's interim managers that the franchises would be terminated; (3) Dunkin' Donuts twice notified Panagakos of violations of the Master Franchise Agreement without referring to his criminal convictions; (4) Dunkin' Donuts never suggested that Panagakos complete the NB18 shop as anything but a Dunkin' Donuts' outlet; and (5) Dunkin' Donuts accepted Panagakos's franchise fees without any reservation of rights. Defendant's Opposition, p. 13–14.[10]

All but the first of these purported indicia of waiver involve Dunkin' Donuts' silence. While it is doubtful that mere silence could satisfy Panagakos's burden of establishing "'clear, decisive, and *unequivocal* conduct on [Dunkin' Donuts'] ... part,'" *Paterson–Leitch*, 840 F.2d at 992, the undisputed facts show affirmative conduct by Dunkin' Donuts inconsistent with any intent to waive its rights.[11] On the day following Panagakos's guilty plea, Dunkin' Donuts began an audit and investigation of Panagakos's operation of the franchises. By June, it had commissioned outside counsel to begin the termination process. In October, after Panagakos's release from jail, it served notice of the revocations. Panagakos's one substantive point, that Dunkin' Donuts permitted him to complete and open the NB18 shop despite his convictions founders on the lack of any evidence disputing Dunkin' Donuts' corporate policy of permitting troubled franchisees to sell their shops as going concerns.[12]

9. The law distinguishes equitable estoppel, where there has been reliance upon a misrepresentation of past or present facts from promissory estoppel where reliance is placed upon statements of future intent. *Loranger Construction Corp. v. E.F. Hauserman Co.*, 6 Mass.App.Ct. 152, 155, 374 N.E.2d 306 (1978). Panagakos is presumably claiming the latter, that is, that Coba, through Gaberielli, mispresented Dunkin' Donuts' future intent regarding his status as a franchisee. In either event, the legal principles are the same.

10. Panagakos also suggests that Dunkin' Donuts delayed for fear that an intervening foreclosure by Shawmut Bank might lose the NB18 site to its system. Panagakos, however, has offered no evidence that his difficulties with Shawmut influenced the timing of Dunkin' Donuts' decision to terminate.

11. Dunkin' Donuts' silence, such as it was, is relevant, if at all, to the issue of estoppel, that is, whether Panagakos was or was not reasonably misled by Dunkin' Donuts' failure to speak.

12. That Dunkin' Donuts did not serve the termination notices until eight months after Panagakos's guilty plea does not present a triable issue of fact, given the undisputed evidence that Dunkin' Donuts management was proceeding on a deliberate and consistent internal path to termi-

■] Panagakos's second argument, that Coba's hearsay assurance is evidence of an affirmative waiver by Dunkin' Donuts,[13] is rebutted by the undisputed fact that Coba had no actual authority to effect a waiver of Dunkin' Donuts' termination rights. Panagakos concedes as much but argues that Coba was acting with apparent authority when he told Gabellieri that Dunkin' Donuts would "stick" with Panagakos.[14] Dunkin' Donuts counters that an agent acting with apparent authority does not have the power to waive a contract term. Dunkin' Donuts notes that in *Paterson–Leitch*, 840 F.2d at 992, the First Circuit Court of Appeals stated that "[a] finding of waiver must be premised upon 'clear, decisive, and *unequivocal* conduct on the part of an *authorized representative....* " (Emphasis added.) This is because apparent authority arises from "written or spoken words or other conduct by the principal which reasonably interpreted, cause a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." See also *Weisman v. Saetz*, 11 Mass.App.Ct. 440, 442, 416 N.E.2d 1007 (1981); *Rubel v. Hayden, Harding & Buchanan, Inc.*, 15 Mass.App.Ct. 252, 255, 444 N.E.2d 1306 (1983). Because the analysis focuses on the reasonableness of the third party's reliance, the issue of apparent authority, while relevant to an estoppel claim, has no place in the law of waiver.

Even were this not the case, Panagakos has failed to produce any evidence of words or conduct by Dunkin' Donuts that could have reasonably been interpreted as imbuing Coba with actual authority to waive a material provision of the Master Franchise Agreement. Panagakos suggests that such authority could be inferred from the fact that Coba signed the Franchise Agreements for Dunkin' Donuts. The authority to sign a contract, however, without more, does not as a matter of law imply authority to waive rights under the contract. 3 Am.Jur.2d *Agency* § 90 (1986).[15] *Costonis v. Medford Housing Auth.*, 343 Mass. 108, 114, 176 N.E.2d 25 (1961) (housing authority's executive director was the only person who had been delegated the power to act and the only official of the authority with whom plaintiff dealt). Dunkin' Donuts motion for summary judgment on Panagakos's waiver defense will therefore be *ALLOWED*.

**B.  Estoppel**

■] Dunkin' Donuts also seeks summary judgment on Panagakos's estoppel defense. To successfully invoke estoppel Panagakos must establish that Dunkin' Donuts' conduct amounted to a representation that was intended to induce a course of conduct on his part and that he did reasonably rely on that conduct to his detriment. *Cellucci*, 2 Mass. App.Ct. at 728, 320 N.E.2d 919. Although estoppel can be based on mere silence, that is true only where there is a duty to speak and the ensuing silence is "wrongful [and] misleading." *Lawyers Title Ins. Corp. v. U.S. Savings Bank of America*, 1990 WL 29214, at *6 (D.Mass.1990) (citing *United States v. Dickinson*, 95 F.2d 65, 68 (1st Cir.1938)).

■] Moreover, as the First Circuit Court of Appeals noted in K–Mart Corp. v. Oriental Plaza, Inc. 875 F.2d 907, 910–911 (1st Cir.1989), a party claiming the protections of estoppel must have clean hands. In

nation, and served notice of its decision almost immediately after Panagakos was released from jail.

**13.**  This of course, presumes its admissibility, by no means a certain proposition. Cf. *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1093–1094 (1st Cir.1995).

**14.**  Panagakos argues that Gabellieri and Dunkin' Donuts Real Estate Manager, Daniel Ciampitiello, also waived Dunkin' Donuts' right to terminate Panagakos's franchises because they acquiesced in the continued construction of NB18. This argument suffers from the same defect as

the argument made with respect to Coba, that is, the absence of any showing of actual authority on their part.

**15.**  Dunkin' Donuts, citing *Aircraft Sales of Cal. Inc. v. Insured Aircraft Title Service, Inc.*, 951 F.2d 1258, 1260 (10th Cir.1991), also argues that Panagakos's late-blooming recollection should be treated as a recent fabrication because Panagakos made no reference to Coba's supposed statement in his two letters of expiration to Dunkin' Donuts when it "would be expected that some mention [of the statement] would have been made."

*K–Mart,* the Court held that a contracting party had no duty to act within fifteen months of discovering a breach of contract where the defendant had attempted to conceal the breach. "A party seeking to invoke the aid of equity should not be encouraged to call the other party's attention to his left hand, while surreptitiously pocketing the family jewels with the right hand." Id. 875 F.2d at 911.

Panagakos argues that he does not have "unclean" hands because his tax offenses were not directed against Dunkin' Donuts. See *Amerada Hess Corp. v. Garabedian,* 416 Mass. 149, 156, 617 N.E.2d 630 (1993). Panagakos's argument misses the point. Even if for present purposes the law might not deem Panagakos's hands as sullied by his acts of tax evasion,[16] he is unworthy of equitable relief. This is because his argument, that Dunkin' Donuts should have responded more quickly to his indictments, ignores the fact that Dunkin' Donuts was gulled into complacence by his deliberate lies about his guilt. The only event attributable to Dunkin' Donuts following the convictions that might reasonably have stirred false hopes in Panagakos was the permission given by Dunkin' Donuts to open the NB18 shop. It is, however, undisputed that construction of the store had been authorized during the time that Panagakos was falsely protesting his innocence. If Panagakos had not lied about his guilt, Dunkin' Donuts presumably would not have made the decision that Panagakos now faults. Because Panagakos's misrepresentations regarding his innocence were in fact directed at Dunkin' Donuts and are directly connected to his estoppel claim, the defense, even were it viable, is unavailable to Panagakos.[17] Dunkin' Donuts' motion for summary judgment on Panagakos's estoppel defense will therefore be *ALLOWED.*

**16.** Panagakos's argument that his tax evasion had nothing to do with Dunkin' Donuts ignores the fact that the offenses did not involve his personal tax returns but those of his Dunkin' Donuts' franchises.

**17.** Panagakos has also failed to establish that he suffered any detriment in reliance on Dunkin' Donuts' conduct because he has not disputed the

*C. Counterclaims*

■ In Count I of his counterclaim, Panagakos alleges that Dunkin' Donuts breached the Franchise Agreements by "attempting to terminate" those contracts and by not allowing Panagakos to develop new franchises. Similarly, in Count V, Panagakos alleges that Dunkin' Donuts violated G.L. c. 93A by intentionally breaching the Franchise Agreements and by filing this lawsuit. Because Dunkin' Donuts is entitled to summary judgment on its Complaint seeking termination of the Franchise Agreements, claims based on any alleged breaches of the Agreements necessarily fail. Cf. *Ahern v. Scholz,* 85 F.3d 774, 798 (1st Cir.1996).[18]

Panagakos alleges in Count II that Dunkin' Donuts violated the implied covenant of good faith and fair dealing by: (1) terminating the franchises; (2) filing this action; (3) preventing him from expanding his franchises; (4) attempting to coerce him into selling his franchises; (5) refusing to allow him to participate in new product programs; and (6) allowing a Mister Donut shop to be converted to a Dunkin' Donuts shop near the Franchise operated by 807 Corp.

All but the last allegation, like the two previous counts, fail because Dunkin' Donuts was justified in terminating the Franchise Agreements and the claimed breaches implicate rights held only by a franchisee in good standing. Moreover, there is no evidence that Dunkin' Donuts engaged in behavior evincing "an aspect of fraud, deceit, or misrepresentation." *A. John Cohen Ins. Agency, Inc. v. Middlesex Ins. Co.,* 8 Mass.App. Ct. 178, 183, 392 N.E.2d 862 (1979). In a franchise setting

> [a] mere finding that there was no 'good' reason for the termination in the absence of other indicia of lack of honesty or taking

evidence that completion of the NB18 shop significantly enhanced its value. Nor has he produced any evidence that he would have been in a better position if he had converted the franchise before it was completed.

**18.** Count V, and parts of Count II, duplicate the abuse of process claim set out in Count IV.

unfair advantage; or bad faith, is insufficient to support a [good faith] claim.

\* \* \* \* \* \*

By contrast, in those cases where the plaintiff has prevailed, the evidence has suggested that the defendant was in essence motivated by a desire to capitalize on the plaintiff's business opportunities under the franchise agreement by constructively or pretextually terminating the franchise agreement without compensation. *Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. 929, 938–939 (D.Mass.1995). There is simply no evidence that Dunkin' Donuts was "motivated by a desire to capitalize on [Panagakos's] business opportunities."

To the extent that Count II is based on the conversion of a Mister Donut shop to a Dunkin' Donuts shop in the area served by the 807 franchise, Dunkin' Donuts' decision was authorized by the Master Franchise Agreement. The implied covenant of good faith cannot override the express terms of a contract.[19] *Health Plans, Inc. v. New York Life Ins. Inc.*, 898 F.Supp. 941, 948 (D.Mass. 1995). Moreover, the weight of authority holds that the good faith covenant cannot create territorial rights for a franchisee in the face of contractual language similar or identical to that found in Panagakos's Franchise Agreements. See *Patel v. Dunkin' Donuts of America, Inc.*, 146 Ill.App.3d 233, 100 Ill.Dec. 94, 496 N.E.2d 1159, 1161 (1986).[20]

In Count IV Panagakos alleges an abuse of process based on Dunkin' Donuts' filing of this action. Panagakos has, however, failed to produce any evidence that Dunkin' Donuts filed this suit with "coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender

of property." *Powers v. Leno,* 24 Mass.App. Ct. 381, 383, 509 N.E.2d 46 (1987). See also *Silvia v. Building Inspector of West Bridgewater,* 35 Mass.App.Ct. 451, 453, 621 N.E.2d 686 (1993).

### ORDER

For the foregoing reasons, Dunkin' Donuts' motion for summary judgment is *ALLOWED* as to all counts.

SO ORDERED.

---

**19.** Each franchise agreement states that Dunkin' Donuts "in its sole discretion, has the right to operate or franchise other DUNKIN' DONUTS SHOPS ... on such terms and conditions as DUNKIN' DONUTS deems acceptable." ¶7.A.1. Further, under the Franchise Agreement Panagakos agreed that his licenses were "non-exclusive" and that each franchise received a license to operate "at one location only." ¶1.A.

**20.** Panagakos's claim is also flawed because he failed to avail himself of administrative procedures that might have made this claim unneces-

sary. It is undisputed that Dunkin' Donuts had implemented a policy for mediating franchisee complaints that a new Dunkin' Donuts' shop was having a "material, adverse, and prolonged" impact on his or her sales. Laudermilk Affidavit, ¶5. In such cases, Dunkin' Donuts meets with the complaining franchisee and reviews possible remedies. Panagakos testified that he was told of this program by Gabellieri, but never invoked it because "no one really has gotten anywhere with those programs." Panagakos Deposition, at 312.