**DUNKIN' DONUTS INCORPORATED,**
**Plaintiff,**

v.

**GAV–STRA DONUTS, INC.,**
**et al., Defendants.**

**No. Civ.A. 99–11526–PBS.**

United States District Court,
D. Massachusetts.

April 10, 2001.

---

Robert L. Zisk, Thomas M. Finan, Schmeltzer, Aptaker & Sheppard, Washington, DC, Jeffrey L. Karlin, Schmeltzer, Aptaker & Sheppard, P.C., Washington, DC, Robert A. Murphy, Casner & Edwards, Boston, MA, Joan M. Griffin, Testa, Hurwitz & Thibeault, Boston, MA, Thomas P. Carroll, Stephen J. Vaughan, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, Eric L. Yaffe, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, for Plaintiff.

Frank J. Teague, Mills & Teague, Douglas M. Brooks, Martland & Brooks, Harold Brown, Law Office of Harold Brown, L. Seth Stadfeld, Weston Patrick Willard & Redding, Andrea B. Aptowitz, Harold Brown & Associates, Boston, MA, Fatema Dahodwala, John J. Washburn, Gerald Venezia, North Reading, MA, Stephen J. Reid, Blish & Cavanagh, Providence, RI, A. David Mazzone, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiff Dunkin' Donuts Incorporated

("Dunkin' Donuts") brings this action[1] against franchisee Gav–Stra Donuts, Incorporated ("GSDI") and its shareholders Michael Gavriel, Cathy Gavriel, and George Stratis to enforce termination of the franchise agreement and to require Defendants to comply with their post-termination obligations. Dunkin' Donuts moves for partial summary judgment on the ground that Michael Gavriel's conviction for tax fraud involving GSDI's Dunkin' Donuts franchise gives it the contractual right to terminate the franchise agreement. After a hearing, the Court *ALLOWS* Plaintiff's motion on both counts against all Defendants, enjoins Defendants from further use of Dunkin' Donuts trademarks, and awards attorney's fees to Plaintiff.

## II. BACKGROUND

The following facts are undisputed except where stated. George Stratis and Michael Gavriel first met when Stratis worked as a baker at a Dunkin' Donuts franchise owned by Gavriel. Stratis, a Greek immigrant, saved $100,000 and approached Gavriel about starting their own Dunkin' Donuts franchise as business partners. The two agreed on a division of labor. Stratis would work at the store full time providing active day-to-day management. Gavriel would provide his experience in franchising (as a shareholder in four franchise operations), dealing with suppliers, and dealing with Dunkin' Donuts. As Stratis speaks little English, Gavriel and he communicated primarily in Greek. The shareholders agreement stated that Stratis and Gavriel would each own 50 percent of the stock of GSDI, that Stratis would lend the corporation his $100,000 for five years at 10 percent inter-

est per year, and that Gavriel would either lend $70,000 to the company or secure bank financing for the company. (He later secured a $70,000 loan for GSDI from Mercantile Bank.)

Stratis and Gavriel signed a franchise agreement with Dunkin' Donuts, the franchisor, on April 30, 1990 and began operating the franchise store at 210 Harvard Avenue in Allston, Massachusetts. While Stratis understood that the purpose of the agreement with Dunkin' Donuts was to be licensed as a franchisee, he did not fully understand the conversations at the signing because they were in English. Nevertheless, he signed the documents as Gavriel instructed him.

The franchise agreement lists Michael Gavriel, Cathy Gavriel, George Stratis, and Gav–Stra Donuts, Inc. as the "individuals or entity hereinafter referred to collectively as 'FRANCHISEE.' "[2] The contract provides:

> [FRANCHISEE shall not] ... do or perform, directly or indirectly, any ... act injurious or prejudicial to the goodwill associated with DUNKIN' DONUTS PROPRIETARY MARKS and the DUNKIN' DONUTS SYSTEM. (¶ 8.A.1.)

> FRANCHISEE agrees to comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities including, but not limited to, health departments, Board of Fire Underwriters and other similar organizations. (¶ 5.Q.)

Unless otherwise specified, the franchise has a 30–day cure period. (¶ 9.B.3.) However, no cure period is available if the franchisee "falsifies financial data." (¶ 9.B.4.) If

---

**1.** The amended complaint alleges ten counts against multiple parties. The allegations relevant to this summary judgment motion are breach of contract (Count I) and trademark infringement (Count II). Ms. Cathy Gavriel

has not opposed the motion for summary judgment.

**2.** Cathy Gavriel's name is written in by hand.

a franchisee fails to cure a default, following notice, or if the agreement is terminated, the franchisee must pay to Dunkin Donuts damages, costs, expenses, interest at 18 percent per annum and attorneys' fees. (¶ 9.C.2.)

Upon termination, the franchisee must also immediately cease using Dunkin Donuts' methods, proprietary marks, trade secrets, confidential information, operating manuals and the like. (¶ 9.F.2.)

The individual defendants also personally guaranteed performance under the Franchise Agreement, including Paragraph 8, which contains the goodwill provision. Defendants also guaranteed and agreed that Paragraph 8 "shall be binding on each of us personally, as if we were the franchisee."

## Michael Gavriel's Criminal Activity

In December 1998, Gavriel pled guilty to a criminal Information charging him with conspiracy to defraud the United States by impeding and impairing the lawful government functions of the Internal Revenue Service. *United States v. Gavriel*, No. 98–10282 (D.Mass. Sept. 10, 1998). He was sentenced on June 15, 1999 to two years probation and payment of a $5,000 fine and a $100 special assessment, and was ordered to file accurate tax returns for the years he did not do so. His plea and sentence, as well as his connection to Dunkin' Donuts, were publicized in restaurant trade magazines, an accounting news publication, and in at least one newspaper of general circulation.

The criminal Information states that between 1983 and 1997, Michael Gavriel executed a scheme with West Lynn Creamery ("West Lynn"), Dunkin' Donuts' approved vendor of dairy products, to defraud the IRS. Gavriel ordered products from the creamery, which then generated inflated invoices for those purchases. Gavriel used his franchises, including GSDI, to issue checks to pay the false invoices. West Lynn then issued rebate checks either to Gavriel directly or to the Community Credit Union of Lynn to repay Gavriel's personal loans.[3]

Between 1990 and 1992, Gavriel fraudulently converted from GSDI over $40,000 via the creamery rebate scheme and another $23,000 by writing corporate checks for personal use and manipulating payments between GSDI and Gavriel's other corporate entities. He filed false personal tax returns with the IRS for each year from 1992 to 1996. He also failed to report this rebate income on GSDI's tax returns. Thus, GSDI's tax returns for those years were also false because they included higher costs and smaller profits than should have been reported. (However, as defendants point out, the rebates were not reported to the IRS because they were not received by GSDI). Although the IRS has never taken any action against GSDI, the corporation did file amended returns in 1997 as soon as it received the funds after the state court litigation.

## State Court Proceedings

Stratis filed an action against Gavriel in Norfolk Superior Court on August 13, 1992 after his son, Efstratios "Steve" Stratis, reviewed GSDI's financial records and raised questions about some of Gavriel's transactions. When he filed the suit, Stratis successfully moved for a temporary restraining order preventing Gavriel from entering the premises or involving himself

---

**3.** It is unclear to whom the checks were made payable after the Credit Union loans were paid off. Plaintiff asserts that some of the post-loan repayment checks were made payable to GSDI. Defendants Stratis and GSDI dispute this, claiming that the checks were never issued to the corporate franchisee. The criminal Information states that funds were made payable to "entities controlled by Gavriel," but does not specifically mention GSDI.

in the business in any way. GSDI also informed the IRS in 1994 of Gavriel's criminal scheme.

After a fourteen-day bench trial, Stratis prevailed on his claim of breach of fiduciary duty. In addition to giving GSDI monetary compensation for the converted funds, the court gave Stratis control over GSDI operations by permanently enjoining the Gavriels from interfering in any way with the operation of the business, including entering onto its premises except by permission of George Stratis or his agent. Since 1992, Stratis and his son have operated the franchise without involvement by Gavriel. The business prospered. At the time of judgment, gross sales had increased to $16,000 per week.[4]

In June 1999, Gavriel filed suit against Stratis and GSDI in Suffolk Superior Court asserting that Stratis' negligent operation of the franchise was jeopardizing GSDI's franchise relationship with Dunkin' Donuts. Gavriel sought a preliminary injunction restraining any expenditures from GSDI's operating accounts. The Superior Court denied the motion and ruled that in light of the injunction from Stratis' suit, any further proceedings should occur in Norfolk Superior Court. *Gavriel v. George Stratis and Gav–Stra Donuts, Inc.*, No. 99–2685H (Mass. Superior Ct. June 9, 1999). Gavriel has not pressed any of these claims.

In October 2000, Stratis and GSDI filed a complaint against Dunkin' Donuts in Norfolk Superior Court to recover all damages and legal fees incurred in defending against Dunkin' Donuts' claims in the instant case. *Gav–Stra Donuts, Inc. et al. v. Dunkin' Donuts Inc. et al.*, No. 00–01492 (Mass. Superior Ct. Oct. 2, 2000). In addi-

tion, that complaint challenges Dunkin' Donuts' refusal to permit a ten-year renewal of the Franchise Agreement. That case is pending.

## Actions by Dunkin' Donuts

On October 12, 1998, Dunkin' Donuts sent Michael Gavriel (with a copy to Stratis) a Notice of Default/Notice to Cure, stating that the franchisor had become aware of the U.S. Attorney's Information against Gavriel and that Gavriel's actions, if true, "may constitute material breaches of the franchise agreements and grounds for termination." (Notice of Default/Notice to Cure, at 3.) After this Notice, Dunkin' Donuts attempted to negotiate with Gavriel for a termination of interests in the franchise. When that failed, Dunkin' Donuts issued to Gavriel's attorney a Notice of Termination on June 24, 1999. The notice cites violations of ¶ 8.A.1 and ¶ 5.Q of the Franchise Agreement as reasons for termination. Although Stratis and GSDI did not receive copies of that notice, they did receive a Supplemental Notice of Termination dated September 24, 1999, which cites the same contractual violations stated in the original Notice of Termination sent to Gavriel and demands immediate compliance with all post-termination obligations set forth in Paragraph 9 of the Franchise Agreement, including the cessation of use of all Dunkin' Donuts trademarks. By its terms, the franchise agreement expired on April 16, 2000. It was not renewed. To date, GSDI—with Stratis and son as managers—continues to operate the store.

There is a dispute over when Dunkin' Donuts became aware of Gavriel's misconduct. GSDI and Stratis contend that they "promptly informed" Dunkin' Donuts rep-

---

**4.** After the judgment entered, Dunkin' Donuts failed GSDI in various periodic inspections. Defendants claim that this was a harassing tactic designed to force defendants to sell the franchise at an unfair price. Dunkin' Donuts denies this allegation. The Court need not resolve this dispute which is not material to the breach of contract claim and has sparked yet another lawsuit.

resentatives of the misconduct upon learning of it themselves in 1992. Dunkin' Donuts claims that it had no knowledge of the rebate scheme until learning that Gavriel had been criminally charged in 1998, and that immediately thereafter, the franchisor issued the Notice of Default/Notice to Cure.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36–37 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)), *cert. denied*, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). To prevail on summary judgment, the moving party must show that there is an absence of evidence to support the non-moving party's position. *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue that is both genuine and material. *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To oppose summary judgment successfully, the non-moving party "may not rest upon the mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc*, 6 F.3d at 841 (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### B. Breach of Contract Claim against Michael Gavriel

■ Dunkin' Donuts argues that Michael Gavriel breached the goodwill provision (¶ 8.A.1) of the franchise agreement. I agree. Many courts have concluded that a franchisee's guilty plea to criminal charges arising out of the operation of the franchise is injurious and prejudicial to the franchisor's goodwill. *Dunkin' Donuts Inc. v. Panagakos*, Bus. Franchise Guide (CCH) ¶ 11,174 (D.Mass. May 13, 1997) (Stearns, J.) (holding that "no reasonable jury could find that Panagakos' involvement in a tax evasion scheme intimately connected with the operation of his Dunkin' Donuts franchise was not a material breach" of ¶ 8.A.1 of the franchise agreement); *Dunkin' Donuts Inc. v. Chieng–Eung Thiem*, CV 93–0419–JSL (Tx), slip op. at 3 (C.D.Cal. Mar. 9, 1993) (granting summary judgment for plaintiff upon finding intentional underreporting of sales to the taxing authorities to be a breach of the goodwill provision of the franchise agreement); *Palombi v. Getty Oil Co.*, 501 F.Supp. 158, 162 (E.D.Pa.1980) (granting oil supplier's motion for summary judgment on service station's claim of improper termination of franchise agreement because service station operator's conviction for price gouging injured supplier's reputation for integrity and fairness); *Serubo Cadillac Co., Inc. v. Cadillac Motor Car, Div. of General Motors Corp.*, Civ. A. No. 79–613, 1986 WL 4524, at *9 (E.D.Pa. April 15, 1986) (holding that pleas of guilty

and subsequent sentencing for tax evasion adversely affected GM's reputation and thus were adequate grounds for GM's termination of the car dealership agreement). *Cf. Shell Oil Co. v. Altina Assoc., Inc.*, 866 F.Supp. 536, 541–42 (M.D.Fla.1994) (holding under the Petroleum Marketing Practices Act that tax evasion charges filed against the franchisee resulted in loss of goodwill and was grounds for termination of the franchise agreement).

Dunkin' Donuts also argues that Gavriel's criminal conduct violated the "obey all laws" provision (¶ 5.Q) of the franchise agreement. I agree again. *See Chieng–Eung Theim*, CV 93–0419–JSL (Tx), slip op. at 3 (granting summary judgment on Dunkin' Donuts' breach of contract claim, holding that the franchisee breached I 5.Q of the Dunkin' Donuts franchise agreement by underreporting sales to the taxing authorities); *Dunkin' Donuts Inc. v. Chetminal, Inc.*, Bus. Franchise Guide (CCH) ¶ 11,290 (S.D.Fla. Oct. 30, 1997) (holding that sales of cigarettes to minors in the store was an incurable ¶ 5.Q violation); *Dunkin' Donuts Inc. v. Taseski*, 47 F.Supp.2d 867, 877 (E.D.Mich.1999) (enforcing franchisor's termination of franchise agreement when franchisees stipulated that they underreported sales, underpaid their obligations and falsified financial records).

Because Michael Gavriel is defined to be a "franchisee," Michael Gavriel's tax fraud conspiracy arising out of the operations of the franchise constitutes a breach of the "goodwill" and "obey all laws" provisions of the franchise agreement.

## C. Defenses of George Stratis and GSDI

### 1. *Cure*

■ Nonetheless, Stratis argues that neither GSDI nor he should be held responsible for Gavriel's criminal conduct since they were not involved in any way in his crime. Unfortunately, the franchise agreement lists each party individually and clearly states that these parties are regarded collectively as the "franchisee." Therefore, the unlawful act of one is the unlawful act of all. *See Restatement (Second) of Contracts*, § 288(2) (1979) ("Unless a contrary intention is manifested, a promise by two or more promisors is a promise that the same performance shall be given."); *id.* § 289(1) ("where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof"). The default and termination provisions are triggered when any listed individual commits an unlawful act.

■ The harder question is whether Gav–Stra and Stratis cured any default caused by Michael Gavriel's criminal conduct. Paragraph 9 of the Franchise Agreement deals with franchisees' defaults. With certain exceptions, the Franchise Agreement provides for a 30–day cure period. GSDI and Stratis claim they cured Gavriel's defaults by uncovering his illegal activities; obtaining a preliminary injunction in 1992 in state court; recovering all diverted monies and properly accounting for those monies for tax purposes; reporting Gavriel's illegal conduct to Dunkin' Donuts in 1992; and reporting Gavriel's illegal conduct to the IRS which resulted in Gavriel's criminal conviction. Defendants point out that these cures took place *before* Dunkin' Donuts sent a notice of default.

Dunkin' Donuts argues that the notice to cure provision does not apply to breaches involving dishonesty that diminishes a company's good will. *See Panagakos*, Bus. Franchise Guide (CCH) ¶ 11,174 (stating that franchisee's criminal conduct in engaging in tax evasion justified termination of the franchise agreement without an opportunity to cure). *Cf. Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d

12, 20 (1st Cir.1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensated in damages. Accordingly, this kind of harm is often held to be irreparable."); 6 *Corbin on Contracts* § 1266, at 23 (1997 Supp.) ("There was a frustration of purpose when a breach involving fundamental dishonesty by one party occurred, because no amount of payment for past thefts by [defendant] could ever restore the business trust and confidence which plaintiff wanted to have in its distributors.").

This case is more complicated than *Panagakos* because here one co-franchisee made his best efforts to cure the dishonesty of another co-franchisee. However, the genie had been let out of the bottle before defendants had a chance to stop it. Despite these good faith efforts, there was media coverage referring to Gavriel as a Dunkin' Donuts franchisee. Another problem with this otherwise sympathetic argument is that the agreement provides in ¶ 9.B.4 that no cure period is available if the franchisee falsifies "financial data." In other words, the parties agreed that falsification of financial data was an incurable breach. Because Gavriel, who was an officer and agent of GSDI, intentionally falsified Gav–Stra's financial data (by overstating expenses and understating profits), and caused false tax returns to be filed, the contract does not give even the innocent defendants an opportunity to cure the breach.

### 2. *Alleged Material Breach of Contract by Plaintiff*

GSDI and Stratis argue that Dunkin' Donuts did not fully perform its own contractual obligations to provide developmental and advisory assistance to GSDI as a franchise, and thus is not entitled to recover for breach against defendants.

 It is well-settled that a material breach of contract by one party excuses the other party from performance as a matter of law. *See HRPT Advisors, Inc. v. MacDonald, Levine, Jenkins & Co., P.C.,* 43 Mass.App.Ct. 613, 626 n. 16, 686 N.E.2d 203 (1997); *Restatement (Second) of Contracts* §§ 237, 242. "A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract[ ].'" *Lease–It, Inc. v. Massachusetts Port Auth.,* 33 Mass.App. Ct. 391, 396, 600 N.E.2d 599 (1992) (quoting *Bucholz v. Green Bros. Co.,* 272 Mass. 49, 52, 172 N.E. 101 (1930)). Such a breach must go "to the root of the contract." *Aerostatic Engr. Corp. v. Szczawinski,* 1 Mass.App.Ct. 141, 145, 294 N.E.2d 521(1973).

Not all breaches of contract by one party will excuse performance by the other. In evaluating a breach of contract, the Court must determine "whether the defendant's breach entitled the plaintiff merely to recovery for that breach while continuing to abide by the contract, or was so material in all the circumstances as to justify the plaintiff in throwing the contract over and suing for the total breach." *Center Garment Co. v. United Refrigerator Co.,* 369 Mass. 633, 638, 341 N.E.2d 669 (1976). *Compare Ward v. American Mutual Liability Ins. Co.,* 15 Mass.App. Ct. 98, 101, 443 N.E.2d 1342 (1983) (finding defendant's wrongful discharge in violation of employment contract to be a breach so material as to release the employees from further contractual obligations) with *Gibson v. City of Cranston,* 37 F.3d 731, 737 (1st Cir.1994) (finding failure of school board to provide evaluations of superintendent insufficient to establish a material breach of her contract).

██ Specifically, defendants claim that Dunkin' Donuts violated ¶ 2.E of the Franchise Agreement, which requires it to assist the franchise by providing "operating procedures to assist the franchisee in de-

veloping ... approved sources of supply[,]" when it selected West Lynn Creamery as the sole approved vendor of dairy products and required franchises to do business with this corrupt vendor. Dunkin' Donuts has submitted undisputed evidence that West Lynn Creamery was not the sole approved vendor of dairy products; Hood is another. Even if it were the sole approved vendor, defendants have produced no evidence that Dunkin' Donuts approved West Lynn Creamery as a source of supply with knowledge of the corrupt rebate scheme. Second, defendants claim a violation of ¶ 2.F, which requires Dunkin' Donuts "to make available to the franchisee any assistance that may be required, based on the experience and judgment of Dunkin' Donuts, in the preopening, opening and initial operation of the Dunkin' Donuts shop and in conforming to the requirements of the Dunkin' Donuts system." Defendants claim that Dunkin' Donuts failed to participate in the Norfolk Superior Court suit against Gavriel brought years after the opening. However, such litigation assistance is not required by ¶ 2.F. Finally, defendants argue that this failure to assist in the litigation violates ¶ 3.A, which requires Dunkin' Donuts "[t]o maintain a continuing advisory relationship with the Franchise, including consultation in the areas of marketing, merchandising, and general business operations." However, failure to participate in litigation among co-franchisees is not failure to consult in the area of "general business operations."

Even if there were glitches in the provision of assistance by Dunkin' Donuts to defendants, there is no evidence they went to the heart of the contract so as to excuse defendants' contractual obligations. Indeed, all the alleged failure by Dunkin' Donuts came well after the criminal activity of Gavriel was in full swing.

### 3. Good Faith and Fair Dealing

■ GSDI and Stratis further argue that Dunkin' Donuts' termination violated the covenant of good faith and fair dealing, implied in every contract under Massachusetts law, which requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. 929, 938 (D.Mass.1995) (quoting *Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 471, 583 N.E.2d 806 (1991)). The argument fails for two reasons. First, "[t]he implied covenant of good faith cannot override the express terms of a contract." *Dunkin' Donuts Inc. v. Panagakos*, 5 F.Supp.2d 57, 64 (D.Mass.1998) (Stearns, J.). The franchise agreement gives Dunkin' Donuts the right to terminate the contract if the franchisee defaults (or, where applicable, fails to cure defaults) on any of the agreement's obligations.

■ Second, there is no evidence of fraud, deceit or misrepresentation by Dunkin' Donuts that would allow a court to find a breach of good faith. As his deposition demonstrated, Gavriel's belief that Dunkin' Donuts knew about the illegal creamery rebate program was not based on facts, but merely speculation. *See Panagakos*, 5 F.Supp.2d at 64 (finding no breach of good faith where franchisor was contractually authorized to terminate the franchise agreement and where there was no evidence of fraud); *Piantes*, 875 F.Supp. at 940 (same); *Health Plans, Inc. v. New York Life Insur. Co.*, 898 F.Supp. 941, 947–48 (D.Mass.1995) (rejecting argument that there was a breach of good faith where defendant's premium rate increase and decision to terminate coverage were consistent with the express terms of the contract). Moreover, defendants contend that Dunkin' Donuts knew that Gavriel

had been in monetary disputes with other franchisees, and failed to disclose this past history to Stratis. There is evidence that an inspector in late 1991 or early 1992 disclosed to defendants that Gavriel had been involved in monetary irregularities in another shop in Watertown. There is no evidence, however, that Dunkin' Donuts or its agents knew about Gavriel's dishonesty at the time the Franchise Agreement was signed.

### 4. *Waiver*

■ To succeed on the waiver defense, GSDI and Stratis must meet the "uncompromising" standard for waiver under Massachusetts law: proof of "clear, decisive, and unequivocal conduct on the part of an authorized representative ... indicating that [it] would not insist on adherence to the [agreement]." *Panagakos,* 5 F.Supp.2d at 60 (quoting *Paterson–Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 992 (1st Cir.1988)). Toward this end, GSDI and Stratis argue that Dunkin' Donuts failed to terminate the contract in 1992 when it first learned of Gavriel's misconduct; the first notice of default came six years later in 1998. The dispute over when Dunkin' Donuts first learned of the misconduct is immaterial. Whether Dunkin' Donuts knew about the scheme or not, it took no affirmative steps to waive its contractual right to terminate. Such affirmative conduct is essential to a waiver claim; mere silence on the part of Dunkin' Donuts does not satisfy GSDI's and Stratis' burden of establishing the clear, decisive, and unequivocal conduct required for waiver. *Id.* at 61. At most, Dunkin' Donuts failed to respond to Stratis' requests for assistance in ending and prosecuting Gavriel's misconduct. When judged by the uncompromising standard for waiver, this lack of response does not constitute a waiver.

### 5. *Laches*

■■ The laches argument also fails. Laches consists of two elements: 1) unreasonable delay in pursuing a claim, and 2) prejudice to the opposing party resulting from that delay. *USL Capital v. New York 30,* 975 F.Supp. 382, 386 (D.Mass. 1996). Even if Dunkin' Donuts did delay in terminating the franchise agreement, there is no evidence that GSDI and Stratis suffered any prejudice from the delay. If anything, the record suggests that Stratis and his franchise store prospered during that time.

### 6. *Equitable Estoppel*

■ GSDI and Stratis also advance an equitable estoppel defense. "[E]stoppel, as an instrument of equity, has the power to extinguish a party's contractual rights even absent evidence of a waiver...." *Panagakos,* 5 F.Supp.2d at 61. The elements of an equitable estoppel claim are: 1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; 2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; and 3) detriment to such person as a consequence of the act or omission. *Hoppe v. Baxter Healthcare Corp.,* 878 F.Supp. 303, 312–13 (D.Mass.1995).

■ GSDI and Stratis argue that Dunkin' Donuts approved the West Lynn Creamery as a vendor knowing that it was involved in the unlawful rebate scheme. There is no evidence to support this contention.

### 7. *Public Policy*

■■ Finally, GSDI and Stratis contend that it would violate public policy to penalize them for Gavriel's misconduct. "It is a principle universally accepted that

the public interest in freedom of contract is sometimes outweighed by public policy, and in such cases the contract will not be enforced." *Beacon Hill Civic Assoc. v. Ristorante Toscano, Inc.*, 422 Mass. 318, 321, 662 N.E.2d 1015 (1996); *see Restatement (Second) of Contracts* § 179. Stratis argues that to punish him by terminating his franchise agreement is to discourage lawful citizens from identifying and reporting criminal conduct. It is an argument analogous to whistleblower protections in the employment context. *See* Mass.Gen.L. ch. 149, § 185 (providing cause of action for employees discharged for reporting violations of public policy). Courts have consistently invoked public policy concerns to protect at-will employees who report an employer's criminal conduct to public authorities or to superiors within the company. *See, e.g., Shea v. Emmanuel Coll.*, 425 Mass. 761, 763, 682 N.E.2d 1348 (1997) (commenting that the reporting of suspected criminal activity should not be discouraged by the threat of discharge); *Smith v. Mitre Corp.*, 949 F.Supp. 943, 951 (D.Mass. 1997) (concluding that blowing the whistle within the company on fraud and false claims by a government contractor is "sufficiently important to command the invocation of the [public policy] exception").

It is a tempting analogy because Stratis was a conscientious, honest franchisee throughout the Gavriel ordeal. However, unlike the prototypical whistleblower case, Dunkin' Donuts is not terminating its franchise agreement with Stratis as retaliation for identifying and reporting Gavriel's criminal conduct, but rather because Gavriel and GSDI breached the material terms of the contract. The Supreme Judicial Court "consistently has interpreted the public policy exception narrowly," *King v. Driscoll*, 418 Mass. 576, 582, 638 N.E.2d 488 (1994), and a federal court sitting in diversity should be loathe to extend state law. *See Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1449 (1st Cir.1995). Therefore,

while it might be appropriate to extend whistleblower protection to certain franchisor-franchisee relations (i.e., where a franchisee is terminated for exposing criminal activities by the franchisor), this is not one.

## D. Trademark Infringement Claim

■ Dunkin' Donuts also claims that Gavriel, Stratis, and GSDI are separately liable for trademark infringement. To show trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a), plaintiff must show that it owns the mark in question, that the defendant's mark is similar to or the same as the plaintiff's mark, and that defendant's use of the mark is likely to cause confusion among consumers. *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 43 (1st Cir.1998).

■ The continued use of a trademark after breach of a franchise agreement is alone dispositive of the infringement issue. *See S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3rd Cir.1992) (holding that franchisee's continued use of franchisor's trademark amounted to infringement under the Lanham Act where franchise agreement was properly terminated for franchisee's failure to pay royalties); *Burger King Corp. v. Majeed*, 805 F.Supp. 994, 1002 (S.D.Fla.1992) (noting the "well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement"). GSDI's franchise agreement with Dunkin' Donuts expired on April 16, 2000 and was not renewed. GSDI continues to operate its franchise store despite the validly terminated/not renewed contract. Accordingly, this Court holds that Dunkin' Donuts prevails on its claim for trademark infringement.

## IV. ORDER

For the foregoing reasons, the Court *ALLOWS* Dunkin' Donuts Motion for Sum-

mary Judgment (Docket No. 17) against all remaining Defendants Michael Gavriel, Cathy Gavriel, George Stratis and GSDI on Counts I and II. The Court also enjoins Defendants from further using the Dunkin' Donuts trademarks, and orders defendants to take appropriate steps to terminate the franchise. The Court also awards attorney's fees as provided by the Franchise Agreement.