## BOYLSTON DEVELOPMENT GROUP, INC. *vs.* 22 BOYLSTON STREET CORPORATION.

Suffolk. January 8, 1992. - April 27, 1992.

Present: LIACOS, C J., ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Urban Renewal. Administrative Law*, Agency's interpretation of statute, Agency's interpretation of regulation. *Estoppel.*

A corporation displaced by an urban renewal project was not entitled to full relocation assistance benefits under G. L. c. 79A, § 7, from a private developer merely by reason of an amendment to G. L. c. 79A, § 7, that changed the definition of an "acquisition" in the context of an urban renewal plan [536-537], and the record of a hearing before the bureau of relocation (in the Executive Office of Communities and Development) did not support the corporation's claim that the amended statute was otherwise applicable [537-538].

The bureau of relocation incorrectly imposed full relocation assistance obligations on a private developer receiving public funding when it construed 760 Code Mass. Regs. § 27.01 (4) (1986), which sets forth the bureau's policies and requirements for urban renewal relocation assistance payments, in a manner that contravened G. L. c. 79A, upon which the bureau's authority is founded. [539-541]

There was no merit to a corporation's claim that the interrelationship between G. L. c. 121B and c. 79A required a private developer to pay the corporation full relocation assistance benefits under G. L. c. 79A, § 7, in connection with its displacement by an urban renewal project. [541]

In a proceeding before the bureau of relocation, there was not substantial evidence upon which to base a conclusion that a corporation, displaced by an urban renewal project, had relied to its detriment upon representations about the scope of relocation assistance available to it. [541-544]

CIVIL ACTION commenced in the Superior Court Department on September 11, 1989.

The case was heard by *Margot Botsford*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Paul M. Osborne* for the defendant.

*Toni G. Wolfman* (*Heather Newton* with her) for the plaintiff.

ABRAMS, J. At issue is whether the plaintiff's[1] obligation to pay the defendant relocation assistance benefits is governed by § 7 or § 14 of G. L. c. 79A (1990 ed.). The bureau of relocation (BOR) in the Executive Office of Communities and Development determined that the plaintiff was required to pay full relocation benefits under § 7. A Superior Court judge set aside the BOR's decision and ruled that the plaintiff's relocation assistance obligation arose out of § 14, which mandates reimbursement only for actual moving expenses.

In her decision, the judge remanded the action to the BOR for a determination of what amount, if any, the plaintiff might owe to the defendant, 22 Boylston Street Corporation (Silver Slipper),[2] under G. L. c. 79A, § 14. The parties subsequently stipulated that the plaintiff was obligated to pay $1,000 in relocation expenses under G. L. c. 79A, § 14. The Superior Court judge then entered judgment for the defendant for $1,000. The defendant appealed. We allowed the defendant's application for direct appellate review. We affirm.

1. *Facts.* We summarize the judge's findings of fact. On December 1, 1980, the plaintiff's predecessor, a nonprofit corporation, purchased the land and building (Boylston Building) located at 2-22 Boylston Street, Boston. The plaintiff's predecessor purchased the property for the purpose of urban renewal and rehabilitation.[3] At the time of the

---

[1]The Chinese Economic Development Council, Inc., was the predecessor in interest to the plaintiff, Boylston Development Group, Inc. For clarity, we shall refer to these entities as the plaintiff's predecessor and the plaintiff, respectively.

[2]The defendant, 22 Boylston Street Corporation, owned and managed the Silver Slipper cocktail lounge.

[3]Because of its location, the Boylston Building initially was a part of the Park Plaza Urban Renewal Plan (renewal plan) and therefore was eligible for funds granted to the Boston Redevelopment Authority (BRA) by the United States Department of Housing and Urban Development (HUD) as part of the Federal Urban Development Action Grant program (UDAG). By the date of the purchase, however, the building no longer was consid-

purchase, the plaintiff's predecessor had plans, not yet implemented, to form a development corporation pursuant to G. L. c. 121A, and had received preliminary financing approval from the Massachusetts Government Land Bank and the Massachusetts Industrial Finance Agency (MIFA).

At the time of the acquisition, the tenants in the Boylston Building were: the Silver Slipper cocktail lounge, a pizza parlor, four adult book shops, and a "smoke" shop. Because it planned to renovate the entire building, on February 10, 1981, the plaintiff's predecessor submitted for the BRA's approval a relocation plan and guide prepared by Relocation Associates, Inc. (Relocation Associates), to assist the tenants' moves to other locations. The guide explained that Relocation Associates was available to assist tenants in planning their moves and submitting claims for relocation assistance. On February 11, 1981, the Silver Slipper received a notice to vacate by July, 1981. This notice referred to the relocation plan, which was ultimately approved by the BRA in November, 1981, and described the relocation benefits offered by the plaintiff's predecessor.[4]

Prior to January, 1982, the Silver Slipper did not use the services of Relocation Associates, which were offered in the notice to vacate. Unlike other Boylston Building tenants, the Silver Slipper also did not enter into a relocation agreement with the plaintiff's predecessor. On June 22, 1981, the plaintiff's predecessor brought a summary process eviction action against the Silver Slipper. By agreement of the parties, a judge of the Boston Municipal Court entered judgment in favor of the plaintiff's predecessor for possession of the premises occupied by the Silver Slipper. The parties' agreement, however, gave the Silver Slipper until August 15, 1981, to

---

ered part of the Park Plaza project area. In November, 1981, the BRA revised the plan, and the Boylston Building was once again brought within its scope and again became eligible for UDAG funding.

[4]At the time the BRA approved the plan, the plaintiff's predecessor had not filed an application for c. 121A status. The plaintiff's predecessor never filed such an application during its possession of the property in question.

relocate and allowed the lounge to use the Boylston Building as its address for licensing purposes until November 1, 1981.

The Silver Slipper continued to conduct business in the Boylston Building after August 15, 1981.[5] On December 29, 1981, the plaintiff's predecessor sent the Silver Slipper a notice to vacate; the notice ordered the Silver Slipper to leave the premises by January 31,. 1982, or pay eviction costs. In January, 1982, the Silver Slipper communicated with Relocation Associates for the first time. On January 6, 1982, Relocation Associates prepared an inventory of the Silver Slipper's property on the leased premises.

On February 4, 1982, the plaintiff's predecessor forcibly evicted the Silver Slipper. The Silver Slipper's property was inventoried and placed in storage at the plaintiff's predecessor's expense for six months. The judge determined that, after six months, the property was disposed of. By this time, the plaintiff's predecessor had abandoned its redevelopment plans and, therefore, its attempt to gain c. 121A status. In April, 1982, the Silver Slipper submitted a claim for $122,065 in relocation compensation for the stored equipment. The plaintiff's predecessor denied the claim, but offered to reimburse the Silver Slipper under the provisions of G. L. c. 79A, § 14, for moving expenses and costs. The Silver Slipper declined the offer.

Almost two years later, in January, 1984, the Silver Slipper submitted to the BOR its claim for relocation expenses. The BOR took no action on the claim until October, 1985. In November, 1984, the plaintiff's predecessor sold the property to the plaintiff, which agreed to rehabilitate the building and lease space at below-market rents to residents of the neighboring communities.[6] The plaintiff assumed all its predeces-

---

[5]The record reflects that the Silver Slipper made one failed attempt to find a new site. There is no evidence that the Silver Slipper ever notified the plaintiff's predecessor of its fruitless effort or that the Silver Slipper made any other attempts to secure a new location.

[6]The plaintiff obtained a UDAG loan of $1,103,000 from the BRA to fund the project. The plaintiff also received a $1,800,000 loan from the Boston Industrial Development Financing Authority (BIDFA) and

sor's rights, obligations, and defenses with respect to the former tenants of the Boylston Building. Pursuant to this commitment, the plaintiff paid relocation benefits to the tenants with whom the plaintiff's predecessor previously had entered into relocation agreements.

2. *Discussion.* A. *Chapter 79A.* We set forth a brief overview of G. L. c. 79A (1990 ed.). Section 3 of the statute lists the entities obligated to provide relocation assistance and the conditions under which such obligation arises: "Any public agency, or any person authorized to take by eminent domain, including corporations established under the provisions of [c. 121A], shall provide relocation assistance and payments under this act upon undertaking a project which results in displacement of occupants by the acquisition of real property or by the issuing of a written order to vacate for purposes of rehabilitation, demolition, or other improvement."[7] G. L. c. 79A, § 3 (1990 ed.). Section 7 enumerates the types of relocation assistance that must be provided; these include, among other things, moving costs, actual direct loss of tangible property resulting from being required to vacate, and relocation expenses.[8] Section 14 applies to "[a]ny person utilizing mortgage financing issued, insured, or subsidized by a public agency, including an agency of the federal government."

---

$4,800,000 in proceeds from the sale of industrial revenue bonds issued by the Massachusetts Industrial Finance Agency (MIFA). Other funding for the project came from private sources.

[7]Neither the plaintiff nor its predecessor is or ever has been a public agency, a person authorized to take by eminent domain, or a c. 121A corporation.

[8]Section 7 I (A) reads: "Any agency or person specified under this act . . . shall make fair and reasonable relocation payments to displaced persons and businesses, upon proper application, for:

"1. actual documented reasonable expenses in moving . . . his business . . . ;

"2. actual direct losses of tangible personal property as a result of moving or discontinuing a business . . . but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the relocation agency; and

"3. actual reasonable expenses in searching for a replacement business . . . ." G. L. c. 79A, § 7 I (A) (1990 ed.).

G. L. c. 79A, § 14 (1990 ed.). Section 14 thus applies to entities beyond the scope of § 3. Under § 14, an entity engaging in "a project resulting in the displacement of occupants, shall provide relocation assistance and a relocation payment to any such displaced occupant for actual reasonable documented expenses in moving his personal property from such real property." *Id.*

The Superior Court judge determined that the plaintiff's predecessor was obligated to provide the Silver Slipper with moving costs pursuant to G. L. c. 79A, § 14.[9] The judge rejected the BOR's conclusion that the Silver Slipper could recover under § 7, which provides for compensation for moving costs, relocation expenses, and actual direct loss of tangible property resulting from being required to relocate.

B. *The Silver Slipper's claim under G. L. c. 79A.* The Silver Slipper maintains that the Legislature's 1973 broadening of the definition of "acquisition" for purposes of the statute expanded the range of entities to which the statute applies.[10] We do not agree. Prior to the 1973 amendment, the term "acquisition" was defined in § 1 of the statute as "a taking of real property by eminent domain or through purchase by an agency, public or private, authorized to take land by eminent domain for a purpose for which such real property might have been taken by eminent domain." G. L. c. 79A, § 1, as amended through St. 1968, c. 759, § 1. By passing St. 1978, c. 863, the Legislature changed the statutory definition of "acquisition" to "the taking of real property by eminent domain, negotiated sale, or other means, *by or ·for any public agency*, or by any person or agency authorized to take by eminent domain, or by a corporation established under the provisions of [c. 121A]" (emphasis added). G. L. c. 79A, § 1 (1990 ed.). The Silver Slipper asserts that this change in definition indicates that the Legislature intended to broaden the

---

[9]The plaintiff agrees that it is obligated to pay the Silver Slipper relocation assistance pursuant to G. L. c. 79A, § 14.

[10]The Silver Slipper advanced this argument before the BOR, which did not address the issue in its decision.

scope of § 3, which applies to any entity "undertaking a project which results in displacement of occupants by the *acquisition* of real property" (emphasis added). G. L. c. 79A, § 3. The Silver Slipper further contends that because the plaintiff's predecessor's renovation project was planned as part of the renewal plan, see note 3, *supra*, the plaintiff's predecessor bought the Boylston Building for the city of Boston.

The Silver Slipper's argument fails to persuade for two reasons. First, there is nothing in the statutory structure that suggests that, in changing the definition of "acquisition," the Legislature intended to alter the scope of entities obligated to provide relocation assistance. The third section of the statute is divided into two parts. See generally G. L. c. 79A, § 3. The first part of § 3 lists the entities subject to the statute's provisions; the second part sets out the circumstances in which obligations to provide relocation assistance arise. "[A]cquisition of real property" that results in displacement is one of the conditions triggering the statute's operation. G. L. c. 79A, § 7. As we read the statute, by expanding the definition of "acquisition," the Legislature intended to broaden the conditions giving rise to obligations under the statute, not the entities subject thereto. The 1973 amendment expands the circumstances in which a "public agency, or any person authorized to take by eminent domain [including a c. 121A corporation]" is obligated to provide relocation assistance to include cases in which a project involves the acquisition of property for the agency (or other covered entity) by another.

Second, even if the amendment to § 1 was intended to expand the category of covered entities, there is nothing in this record to suggest that either the plaintiff's predecessor or the plaintiff bought the property for anyone else. In support of its contention that the plaintiff's predecessor bought the Boylston Building for the city of Boston, the Silver Slipper notes that the plaintiff's predecessor "acquired the Boylston Building in connection with a large urban renewal project undertaken by the City of Boston and its agencies, the BRA [Boston Redevelopment Authority] and the BIDFA [Boston

Industrial Development Financing Authority]. The Building was included in the Park Plaza Urban Renewal Plan." Neither of these facts is sufficient, either alone or with the other, to establish that the plaintiff's predecessor acquired the land and building for the city of Boston.[11]

Similarly, the plaintiff's receipt (through its predecessor) of Federal UDAG funding through the BRA, a loan from BIDFA, and the proceeds of bonds sold by MIFA is insufficient to establish that the plaintiff bought the property for the city of Boston or any other public agency. The Silver Slipper also argues that the use of BIDFA as an intermediary in the transaction between the plaintiff's predecessor and the plaintiff establishes that the plaintiff acquired the property for the city of Boston.[12] This argument is also unpersuasive. The city of Boston, through BIDFA, acted as an intermediary in the transaction between the plaintiff's predecessor and the plaintiff. That does not suggest, however, that the plaintiff acquired the building for the city of Boston.

C. *The Silver Slipper's claim under 760 Code Mass. Regs. § 27.01 (4) (a).* The Silver Slipper maintains that the

---

[11]The Silver Slipper also argues that Federal law dictates that it is entitled to full § 7 relocation payments. The Silver Slipper cites 42 U.S.C. §§ 4601-4655 (1982). This argument is without merit, however, as the Federal statute "has been construed only 'to benefit those displaced by public agencies with coercive acquisition power, such as eminent domain.'" *Department of Community Affairs* v. *Massachusetts State College Bldg. Auth.*, 378 Mass. 418, 426 (1979), citing *Moorer* v. *HUD*, 561 F.2d 175, 182 (8th Cir. 1977), cert. denied, 436 U.S. 919 (1978). See *Parlane Sportswear Co., Inc.* v. *Weinberger*, 513 F.2d 835 (1st Cir.), cert. denied, 423 U.S. 925 (1975). We likewise reject the Silver Slipper's argument that 42 U.S.C. § 4630 (1982) independently requires relocation payments to be made in this case. That section of the statute merely prohibits the head of any Federal agency from authorizing expenditures on redevelopment programs that do not make proper provision for relocation benefits.

[12]The BOR found that "[o]n November 13, 1984, at 4:02 [P.M.], [the plaintiff's predecessor] deeded the [Boylston B]uilding to the [c]ity of Boston, acting through the Boston Industrial Development Financing Agency (BIDFA) for $2,167,000. On the same day, at the same time, for the same . . . price, the [c]ity of Boston, through BIDFA, deeded the building to the [plaintiff]. [The plaintiff's predecessor] retains ownership of the land, but leased it to BIDFA, who, in turn, assigned the lease to the [plaintiff]."

BOR correctly decided that the Silver Slipper is entitled to full relocation assistance under 760 Code Mass. Regs. § 27.01 (4) (a) (1986). That regulation provides that "[t]he policies and requirements for making relocation payments set forth in [760 Code Mass. Regs. §§ 27.00 et seq.] apply without limitation to . . . (2) [p]rivately financed urban renewal which requires approval under [G. L. c. 121B]." The BOR concluded that, applied to this case, the regulation triggers the obligation to pay full relocation assistance benefits. There is no dispute that the Boylston Building is located within a designated urban renewal area and that renovation of the building is thus subject to approval under c. 121B. The Superior Court judge, however, concluded that the regulation could not support a decision for the Silver Slipper because, as applied in this case, it contravenes the governing statute.[13] We agree.

A reviewing court must "accord due weight and deference to an agency's reasonable interpretation of a statute within its charge." *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, 410 Mass. 686, 692 (1991), citing *Massachusetts Medical Soc'y* v. *Labor Relations Comm'n*, 402 Mass. 44, 62 (1988). Furthermore, "an agency is deemed to have not only those powers expressly conferred by statute, but also those reasonably necessary to carry out its mission." *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, *supra* at 692, citing *Morey* v. *Martha's Vineyard Comm'n*, 409 Mass. 813, 818 (1991); *Town Taxi, Inc.* v. *Police Comm'r of Boston*, 377 Mass. 576, 586 (1979). An agency may not, however, apply its regulation in a manner that contravenes the statute upon which the authority to promulgate the regulation is founded. See *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, *supra* at 692. See also *Polednak* v. *Rent Control Bd. of Cambridge*, 397 Mass. 854, 859 (1986).

---

[13]We are not asked to decide whether the regulation, on its face, contravenes the statute. We are confronted only with the application of the regulation to the facts of this case.

The BOR reasoned that because any redevelopment of the Boylston Building after November, 1981, would have been governed by the renewal plan, such redevelopment would have required various approvals under c. 121B. Therefore, the BOR determined, the plaintiff's redevelopment project constituted "privately financed urban renewal which requires approval under [c. 121B]." 760 Code Mass. Regs. § 27.01 (4) (a) (2). The BOR concluded that, under the regulation, the Silver Slipper was entitled to the full panoply of relocation benefits.

The BOR's application of 760 Code Mass. Regs. § 27.01 (4) (a) (2) to this case is inconsistent with the statutory scheme of G. L. c. 79A. Under c. 79A, the extent of a developer's obligation to provide relocation assistance and payments to tenants whom the developer displaces is proportionate to the degree to which the developer receives public financial benefits in connection with the developer's redevelopment activity. Thus, a public agency or a private developer authorized to take by eminent domain must provide the full range of relocation payments contemplated by G. L. c. 79A, § 7. A developer who receives publicly insured or subsidized mortgage financing is obligated only to reimburse its tenants for their actual reasonable moving costs. See G. L. c. 79A, § 14. Finally, a developer who receives no public assistance has no obligation under the statute to compensate displaced tenants.

The BOR's interpretation of 760 Code Mass. Regs. § 27.01 (4) (a) (2), however, dismantles this structure by imposing full § 7 relocation assistance obligations on private developers, not empowered to take property by eminent domain, by virtue of their receipt of public funds. Had the Legislature chosen to subject private developers receiving public funding to carry out projects requiring approval under c. 121B, it could have done so. The BOR may not make this choice in the Legislature's place. See *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, *supra* at 692 ("[T]he department's construction of St. 1934, c. 280 . . .

runs afoul of the statute's plain meaning, and therefore we reverse the agency's construction in this respect").

The Silver Slipper responds that, in order to obtain approval under c. 121B, a project must include a c. 79A relocation plan. G. L. c. 121B, § 48 (1990 ed.). The Silver Slipper further notes that the definition of "relocation payments" in c. 121B, § 1, uses terms also found in G. L. c. 79A, § 7.[14] From this, the Silver Slipper argues that the policies underlying both c. 121B and c. 79A require that full § 7 benefits be paid whenever displacement results from a project requiring approval under c. 121B.[15] There is nothing in the interaction of c. 121B and c. 79A, however, that supports this conclusion.

D. *Estoppel.* The BOR also determined that the plaintiff's predecessor and the plaintiff were estopped from denying liability to the Silver Slipper for full relocation benefits.[16] The Superior Court judge rejected this determination on the

---

[14]Section 1 of c. 121B defines " '[r]elocation payments' [as] voluntary payments whether or not required by [F]ederal legislation made by an operating agency as reimbursement or compensation for the reasonable moving expenses necessarily incurred and any actual, direct loss of property, except good will or profit, suffered by individuals, families, business concerns and nonprofit organizations, resulting from displacement . . . , if such displacement is reasonably required to carry out an urban renewal plan or because of the acquisition of property by an operating agency."

[15]It appears from the record that the Silver Slipper did not raise this argument below. The argument is, therefore, not properly before us. *Commonwealth* v. *Phoenix*, 409 Mass. 408, 415-416 n.4 (1991) ("The theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review . . . ," quoting *Santa Maria* v. *Trotto*, 297 Mass. 442, 447 [1937], overruled on other grounds, *Desmarais* v. *Standard Accident Ins. Co.*, 331 Mass. 199 [1954]).

[16]The Silver Slipper also advances two additional arguments for the first time on appeal. First, the Silver Slipper argues that the plaintiff's predecessor and the plaintiff are contractually liable to the Silver Slipper for the full range of relocation benefits. The relocation guide prepared for the plaintiff's predecessor by Relocation Associates was, according to this argument, an offer, which the Silver Slipper allegedly accepted by filing a claim for benefits more than one year later and after eviction. Second, the Silver Slipper contends that it was a third-party beneficiary of the contract between the plaintiff and its predecessor. We do not address these contentions. See *Phoenix*, *supra*, and cases cited. See also note 15, *supra*.

ground that there was not substantial evidence to support a claim that the Silver Slipper relied to its detriment on the plaintiff's predecessor's representation that it would pay full relocation assistance benefits. There was no error in the Superior Court judge's conclusion.

A successful assertion of equitable estoppel requires: (1) "[a] representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made[;] (2) [a]n act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made[;] (3) [and d]etriment to such person as a consequence of the act or omission." *Cellucci* v. *Sun Oil Co.,* 2 Mass. App. Ct. 722, 728 (1974).[17] The Superior Court judge correctly noted that the "business relocation guide" that the plaintiff's predecessor sent to tenants in the Boylston Building in February, 1981, represented that tenants could receive payment for actual losses of personal property. Furthermore, the judge noted that the notices to vacate sent to tenants by the plaintiff's predecessor at the same time informed tenants that they would receive financial as well as technical assistance. As the Superior Court judge recognized, the BOR was justified in concluding that these representations by the plaintiff's predecessor were intended to induce its tenants to act.[18] The Superior Court judge also assumed, apparently

---

[17]The judge noted in her decision that the "Silver Slipper appears to claim that 'promissory estoppel,' rather than equitable estoppel is at issue here." See *Loranger Const. Corp.* v. *E.F. Hauserman Co.,* 6 Mass. App. Ct. 152, 154-159 (1978). The difference between the two is that under a theory of equitable estoppel, there must be reliance on a misrepresentation of past or present facts, while a theory of promissory estoppel permits reliance on a misrepresentation of future intent. See *id.* at 155. In this case, the distinction is not important because "there was no showing that the Silver Slipper acted or refrained from acting in reliance on any representations, past, present or future, made by [the plaintiff's predecessor]." There was no error.

[18]The BOR's decision emphasizes, at some length, the intensity of the plaintiff's predecessor's efforts to obtain BOR approval of a relocation plan requiring a full range of benefits. Without a showing of detrimental reliance by the Silver Slipper, however, no amount of demonstrated enthusi-

without deciding, that reliance upon these representations by the tenants would havè been reasonable.

An examination of the record, however, reveals that there was not substantial evidence on which the BOR could have based its conclusion that the Silver Slipper relied to its detriment on the plaintiff's predecessor's representations about the scope of relocation assistance available. See G. L. c. 30A, § 1 (*b*). See also *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). The record reveals that in July, 1981, after the plaintiff's predecessor agreed that the Silver Slipper might have more time before vacating the premises, the Silver Slipper sought a new location for its business. The Silver Slipper found new premises nearby but, later that month, learned that it could not move into the new premises after all. The record does not reveal what the Silver Slipper next did. Significantly, there is no indication whatsoever that the Silver Slipper decided against looking for a new location because of its alleged reliance on the plaintiff's predecessor's representation that it would be entitled to recover for inventory losses as well as moving costs.

The record reflects that after the Silver Slipper received its final notice to vacate in late December, 1981, it asked Relocation Associates to prepare an inventory of the Silver Slipper's property on the leased premises. The record also records that Relocation Associates prepared such an inventory. As the Superior Court judge noted, however, it is likely that such an inventory would have been necessary in order to determine reasonable moving expenses as well as the actual value of the property. Thus, the Silver Slipper's actions in obtaining the inventory say little, if anything, about whether the Silver Slipper intended to move its property or, instead, abandon it. Procuring the inventory, therefore, is hardly evidence — and certainly not substantial. evidence — of the Silver Slipper's reliance on the plaintiff's predecessor's represen-

asm on the part of the plaintiff's predecessor can make out an estoppel claim.

tation that it would provide full relocation assistance benefits, including reimbursement for actual reasonable property loss.

Before this court, the Silver Slipper argues in conclusory fashion that it relied on representations made by the plaintiff's predecessor. The Superior Court judge, however, found otherwise. The judge, as finder of fact, determines what evidence to believe and what evidence to reject.[19] The judge also was entitled to conclude that evidence of efforts by Relocation Associates to find new premises for the Silver Slipper, made at the request of the plaintiff's predecessor and without the defendant's knowledge, was not probative on the question of the defendant's reliance.[20] There was no error.

*Judgment affirmed.*

---

[19]The evidence relied on by the Silver Slipper does not undermine the judge's determination that there was no reliance. Roy Serrentino, one of the defendant's principals, said that he had relied on an alleged representation by one of the plaintiff's attorneys that the eviction would not take place until two months after its actual date, February 4, 1982. The attorney in question denies making such a representation. Even if it was made, however, reliance by the Silver Slipper on an agreement to postpone the eviction is irrelevant to the issue of the plaintiff's representations about relocation benefits.

[20]The Superior Court judge did not reach the issue of the BOR's refusal to consider the plaintiff's allegation of misconduct on the part of the Silver Slipper. For this reason, and because we affirm the judgment of the Superior Court judge on other grounds, we also need not reach the claim.