APPEALS COURT 
 
 NAHANT PRESERVATION TRUST, INC., & others[1] vs. NORTHEASTERN UNIVERSITY (and a consolidated case[2])

 
 Docket:
 23-P-482
 
 
 Dates:
 February 14, 2024 - September 16, 2024
 
 
 Present:
 Vuono, Massing, & Toone, JJ.
 
 
 County:
 Essex
 

 
 Keywords:
 Municipal Corporations, Parks. Parks and Parkways. Public Land. Contract, Private college, Promissory estoppel. Estoppel. Practice, Civil, Summary judgment.
 
 

             Civil action commenced in the Land Court Department on August 9, 2019.
            Civil action commenced in the Superior Court Department on August 20, 2019.
            After consolidation, the cases were heard by Jeffrey T. Karp, J., on motions for summary judgment.
            Harley C. Racer for the plaintiffs.
            George X. Pucci for the intervener.
            Kevin P. O'Flaherty (John F. White, III, also present) for the defendant.
            VUONO, J.  At the center of the dispute between the parties is approximately twelve acres of undeveloped registered land on a peninsula known as East Point located in the small North Shore town of Nahant (town).  The defendant, Northeastern University (Northeastern),[3] acquired a 20.4-acre parcel, including the twelve acres in question, from the Federal government in 1966 and has operated its Marine Science Center (center) on a developed portion of the parcel since the late 1960s.  The town owns approximately eight adjacent acres, located south of Northeastern's property, that it acquired from the Federal government in the mid-1970s and that is now the site of a public park known as Lodge Park.  When Northeastern announced plans to expand the center by constructing a new research facility on the undeveloped portion of its parcel, the town, Nahant Preservation Trust, Inc. (NPT), and twenty-eight citizens of the town[4] (collectively, plaintiffs), mounted a vociferous opposition.  Ultimately, two separate but consolidated lawsuits focused on two issues.  The first issue was whether, as the plaintiffs claim, Northeastern permanently dedicated the twelve undeveloped acres of its land to the public for use as an "ecological preserve and for passive recreation" and, as a result, Northeastern could not proceed with the project to expand the center without first obtaining the approval of the Legislature pursuant to art. 97 of the Amendments to the Massachusetts Constitution (art. 97).  The second was whether, as the town claimed, Northeastern was precluded from building on the land under a theory of promissory estoppel because, among other things, the town had relied on Northeastern's purported assurances that the land would be preserved when the town acquired and developed Lodge Park.  A judge of the Superior Court granted Northeastern's motions for summary judgment on all claims, and this appeal followed.
            We conclude that the plaintiffs have no reasonable expectation of establishing that Northeastern dedicated the twelve acres at issue to the public for use as an ecological preserve.  As a result, the land is still privately held by Northeastern and is not subject to art. 97.  Additionally, we conclude that the town has no reasonable expectation of proving that Northeastern made an "unambiguous promise" to preserve any of its land as an ecological preserve, a wildlife refuge, or as open space.  Malden Police Patrolman's Ass'n v. Malden, 92 Mass. App. Ct. 53, 60 (2017).  Accordingly, the allowance of summary judgment in favor of Northeastern on all claims was proper.
            Background.  We recite the material undisputed facts, and the disputed facts in the light most favorable to the plaintiffs as the nonmoving parties, from the record as follows.  In 1941, the United States acquired twenty-eight acres in East Point from the estates of Henry Cabot Lodge and Harmon Elliot by eminent domain.  Thereafter, the land was used for military purposes by the United States Army and Navy.  Underground bunkers and various buildings, including a large structure known as the Murphy Bunker located roughly in the middle of the property, were constructed.  The land east of the Murphy Bunker was cleared and leveled to create an unobstructed firing zone for a defensive military battery pointed toward the ocean.  That land was cleared again in the 1950s to permit installation of antiaircraft guns and additional bunkers.  In 1954, the Army announced plans to construct a Nike guided missile site on the land that eventually became Lodge Park.  In connection with the construction of the missile site, which included underground silos, large amounts of fill were dragged across the area that Northeastern eventually acquired.  As a result of these changes, the area on top of and east of the Murphy Bunker, which the parties refer to as the "upland" area or the "Preserve," and to which we refer as the disputed area, was barren of vegetation and not conducive to recreational pursuits at the time Northeastern acquired the property.
            In the early 1960s, the military facilities were decommissioned, and the town applied to acquire the entire parcel (28.44 acres "at [fifty] percent of fair value") for a public park and related public purposes.  However, following an extensive debate at the annual town meeting held on March 21, 1964, the town declined to authorize funds to purchase the property and indefinitely postponed a vote on the matter.  While the statements of private citizens, and even of town officials, may not be the equivalent of official pronouncements or positions of the town, the transcript from the town meeting provides some historical insight into the town's decision.[5]  The chair of the town's conservation commission (commission), Ruth Alexander, and the chair of the board of selectmen (board), Charles Kelley, each expressed a desire to acquire the property, but also acknowledged concerns about doing so.  One perceived problem with the town's proposal was that once the town owned the land, the general public and not just town residents would have access to it.[6]  Another concern was cost.  Although the town could purchase the land for one-half of its appraised value ($30,000), the initial investment to make the area safe and the expense of maintaining it as a public park were described respectively as requiring "an expenditure of a great deal of money" and "unlimited."[7]  Kelley articulated the dilemma by asking:  "As much as it would be nice for the Town to have it, it boils down to this:  can we afford it?"  A few days after the meeting, the town formally withdrew its application.[8]  By letter dated March 26, 1964, to the regional director of the General Services Administration (GSA), Kelley wrote:  "At our Town meeting on March 21, the Town refused to vote necessary funds to purchase this area.  Therefore, as of this writing the Town has no further interest in the property."
            Despite the concerns that led the town to forego the opportunity to purchase the land, the commission, spearheaded by Alexander, continued to advocate for the right of the town's citizens to access a scenic pathway following the shoreline around East Point.  The town's annual report dated December 31, 1964, states:
"Last year the Town decided not to appropriate money for the purpose of acquiring [the government property at East Point] . . . the [Conservation] Commission feels, however, that at least it would be desirable to acquire for the town people, if possible without expenditure of money, the right to walk along a scenic pathway which would follow as much of the shoreline as is included in this property."
            The commission expressed a view that a college or university would be more inclined than a private developer to provide public access to the walking path, and soon after the town withdrew its application to purchase the property, a subcommittee was formed and undertook the task of finding an educational institution to acquire it.  The subcommittee reached out to various entities and successfully persuaded Northeastern to submit an application, which it did in April 1965.
            Northeastern's proposal ("A Proposal for a Marine Science Research Institute at Northeastern University," hereinafter "the proposal") to the Federal government to acquire the property (all 28.44 acres) described its plan to establish a marine science campus as follows:
"In the event [Northeastern] can acquire title to this East Point Nahant property it proposes to establish a Marine Science Research institute.  This institute would provide a year-round facility for research and instruction in the marine sciences and related fields for Northeastern, as well as other universities and the medical research institutions of Greater Boston."
The proposal further specified that Northeastern would use one of the existing buildings for laboratories and research areas and would construct "[a]dditional facilities" including "a pump house and storage tank for salt water and quarters for a caretaker."  The proposal set forth a detailed summary of future research endeavors, including the exploration of "human life beneath the surface of the sea" and the use of the land as a "supply area for research" and noted, for example, that sea urchin eggs "are in constant demand for cancer research and embryology studies."  The proposal did not exclude further construction.  Nor did it indicate an intention to preserve any portion of the property for public access or recreation.  However, the proposal did include language indicating Northeastern's desire to acquire all of East Point to make it a wildlife preserve:
"Despite its relatively small area, [the town] has an unusually diverse fauna and a wide variety of littoral habitats, ranging from rockbound cliffs and sandy beaches on the seaward side, to tidal mud flats on the landward side.  [Northeastern] seeks to acquire the whole of East Point in order to make it a wildlife preserve.  Only in this way can the unusual littoral and benthonic faunas be protected adequately.  In addition, [Northeastern] can assure that pollution will not jeopardize the continued high quality of the seawater for laboratory studies."
 
            The commission actively supported Northeastern's acquisition of the property.  In a letter dated April 30, 1965, to the GSA, Alexander urged the government to transfer the property to Northeastern.[9]  The board, however, had a different view and Kelley wrote a separate letter to the GSA expressing opposition to Northeastern's acquisition of the property and instead encouraged the Federal government to sell the land to "private interests" that would lead to "attractive and expensive type dwellings" in order to generate tax revenues.  On May 17, 1965, the then president of Northeastern, Asa Knowles, joined the discussion and wrote a letter to the Department of Health, Education, and Welfare.  He noted that Northeastern planned to use the property for research in the area of marine biology and environmental engineering, and further noted that at a recent meeting with the town, Northeastern had
"expressed [its] desire to co-operate in every way with the town officials.  We further assured them we would work with the town in the development of a walkway through the property which could be used by citizens and others to view the ocean and the cliffs.  In this way the town would still have the benefit of the beauty of the area and Northeastern would have the benefit from a utilitarian standpoint."
            On June 30, 1965, Northeastern's application was partially approved when the government agreed to a transfer of 20.4 acres.  The remaining 8.3 acres were reserved for use by the Navy.
            After succeeding in finding an educational institution willing to acquire the land, the commission attempted to obtain a specific commitment by way of an easement or license granting public access to a scenic pathway following the coastline.  In furtherance of this effort, on September 29, 1965, the commission wrote to the GSA requesting that it grant access along the perimeter of the upland adjacent to the tops of the cliffs for foot passage and viewing the scenery before transferring the property to Northeastern either by granting an easement or by a reservation in the deed to Northeastern.[10]  The commission sent another letter to the rear admiral in command of the site requesting that the Navy consider granting permission to the town's inhabitants to have access to the eight acres the Navy had retained "entirely at their own risk and completely subject to the instructions from Navy officials as to where the pathway would be located and when its use would be available."  And third, a similar plea was made by letter to Northeastern's business manager.  That correspondence included a draft "agreement"[11] "concerning the right of the inhabitants of the [t]own to pass on the property."  The commission also offered to drop its request "that the Government grant a more formal right [to it] before the ultimate transfer [of the property] to [Northeastern]" should Northeastern sign the agreement.
            Notwithstanding its efforts, the commission was not successful.  In October 1965, the GSA's chief of the Real Property Division Utilization & Disposal Services, rebuffed the commission's request.  His responsive letter stated:
"We are happy to know that the Commission proposes acquisition of a license or permit [from Northeastern] in lieu of an easement, since we have been informed by the Department of Health, Education and Welfare that it will not accept assignment of the property for transfer to [Northeastern] if such property is encumbered by an easement."
He encouraged the commission to pursue post-transfer negotiations with Northeastern and noted that any resultant agreement would be subject to approval by the Federal government.  There is nothing in the record about the responses from the rear admiral or Northeastern, but it is undisputed that no agreement was executed.  The commission's failure to secure public access was described in the town's 1965 annual report as follows:
"The Commission was not able to secure from the Government and Northeastern . . . assurance that there would be an absolute right on the part of the townspeople to walk on a pathway around the cliffs.  The Commission does, however, hope that some form of visiting privilege for scenic walks will be extended by Northeastern University."
            Thereafter, by a deed dated February 23, 1966, the United States, through its Secretary of Health, Education, and Welfare, officially transferred the 20.4-acre parcel to Northeastern subject to certain covenants, conditions, reservations, and restrictions.  Among other things, the deed reserved an access and utilities easement over an "existing road" on Northeastern's property, and an easement to use existing sewer, water, and electrical conduits for the benefit of the land retained by the Navy.  The deed required that Northeastern use the property "continuously in the manner and for the educational purposes set forth in the approved program and plan contained in the application of Northeastern . . ., dated June 16, 1965, and for no other purpose for twenty years," and barred Northeastern from encumbering or disposing of its interest in the property without approval from the Federal government.  The deed did not mention a walking path or include any rights of the town to access the property.  The two easements set forth in the deed are for the benefit of "the United States of America, its successors and assigns" and relate to the existing road and utilities.
            By the early 1970s, the Navy no longer had any use for the eight acres it had retained.  Both Northeastern and the town submitted proposals to acquire that land, and the town prevailed.[12]  In rejecting Northeastern's application and accepting the town's proposal, the GSA regional administrator noted, as relevant here, that Northeastern had a twenty-acre parcel with "much undeveloped land and appears adequate for the school's use" and that town officials had offered to accommodate Northeastern's programs.  There was no mention that any of the land owned by Northeastern had been dedicated to public use.  Furthermore, when the town acquired the eight acres, the only change to Northeastern's certificate of title was to specify that the town, rather than the United States, was now the beneficiary of the existing road and utility easements.  The town did not seek to amend the deed to reflect any alleged easement by dedication at that time or at any time before this litigation commenced.  As previously noted, the town created Lodge Park on the eight-acre parcel.
            Meanwhile, Northeastern had been operating the center since soon after it acquired the property in 1966, and from time to time found it necessary to take action to curb public access.  For example, in 1967, Northeastern's vice president sent a memorandum to Northeastern staff telling them that "a number of problems" made it necessary to prohibit picnicking and swimming at the facility and "restrict the area to professional activities dealing with the work of the Institute."  In 1969, Northeastern hired a caretaker charged with maintaining and securing the property.  He was instructed to treat all visitors with courtesy, to warn trespassers, and to call the local police if trespassers refused to leave.
            However, despite these efforts, there is no question that members of the public entered the property for a variety of recreational pursuits and sometimes did so with approval.  For example, in 1995, Northeastern permitted a local astrophysicist, Dr. Peter Foukal, to construct a solar observatory on the land above the Murphy Bunker.  The area on top of the Murphy Bunker was cleared to install the observatory.  The observatory remained operable between 1995 and 2018, and the public was able to access the observatory by contacting Dr. Foukal.  Dr. Foukal also opened the observatory to the public on most Friday evenings in the fall.  The observatory was visible from Lodge Park, but the town did not object to the clearing of the land above the Murphy Bunker or to the construction of the observatory.
            In addition, the summary judgment record includes evidence of the public's use of the undeveloped portions of Northeastern's property for walking, birdwatching, and sight-seeing.  One of the individual plaintiffs averred that
"[w]hen [Northeastern] took over the site, it was freely opened to [the] public for recreation and use.  Since that time, the public has used the property for hiking, mountain biking, fishing, picnicking, star gazing[,] and more. . . .  Other public uses include fly fishing and scuba diving.  At the time that [Northeastern] took over the property, there were paths and trails on top of the Battery and down through the wild meadow.  The public has continuously used those paths."
The plaintiffs also presented evidence that the area is a sanctuary for many species of birds, including some that are endangered.  In addition, Northeastern has recognized the area as a wildlife sanctuary and referred to it as such on its website between 1999 and 2007.[13]  There is also evidence that the town, through its open space committee, has identified Northeastern's property as falling within the town's inventory of land used for education and conservation and that the area is now zoned as a natural resource district.
            As described above, the record contains conflicting evidence regarding the extent of public access and the use of Northeastern's property by town residents.  Those conflicts are resolved in favor of the plaintiffs, and for purposes of our discussion we accept, as did the judge, that some town residents have used the disputed area for general recreation over the years.  This use sometimes occurred with Northeastern's permission, and sometimes not, although those who used the area were generally under the impression that it was open to the public.
            We now turn to the present.  In 2018, Northeastern announced plans to build a new 55,000 square foot research facility in the disputed area.  This plan was not well received by the plaintiffs.  In July 2019, NPT sent a letter to Northeastern asserting that Northeastern had, fifty years earlier, made a dedication to the public of the area where the new building would be located.  Therefore, according to NPT, the land was subject to art. 97.  NPT claimed that the project could not proceed without legislative approval and expressed its intent to commence a lawsuit against Northeastern.  Northeastern then filed a complaint in the Land Court seeking a declaration that it had not made a public dedication of the land at issue.  Within days, NPT responded by commencing an action in the Superior Court seeking to apply art. 97.  The Land Court case was transferred to the Superior Court, the Superior Court judge assigned to the case was authorized to sit as a Land Court judge, and the cases were consolidated.  Soon thereafter, the town was allowed to intervene.  Following hearings, Northeastern's motions for summary judgment were allowed in two well-reasoned and detailed memoranda of decisions and orders.
            Discussion.  "We review a grant of summary judgment de novo" to determine whether there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law" (quotations and citation omitted).  Carroll v. Select Bd. of Norwell, 493 Mass. 178, 182 (2024).
            1.  The public dedication doctrine.  The plaintiffs claim that summary judgment should not have been granted because there is a genuine issue of material fact concerning Northeastern's intent to dedicate the disputed area, on which it proposes to construct the new research building, to the public as an ecological preserve and for passive recreation.  If, as the plaintiffs assert, a jury could conclude that Northeastern did in fact dedicate the disputed area to the public, then, as the plaintiffs further assert, the Legislature must approve the proposed project by a two-thirds vote pursuant to art. 97.[14]
            As an initial matter, we note that although the plaintiffs focus on evidence that, at various times, Northeastern expressed its intent to have the disputed land used as a preserve or for similar conservation uses protected by the prior public use doctrine or by art. 97, at trial, the plaintiffs must prove more than Northeastern's intent to dedicate the disputed area to such uses.  They must also prove that the disputed area was actually dedicated to the public, because neither the prior public use doctrine nor art. 97 applies to privately held land.  As we discuss below, such evidence is absent from the summary judgment record.
            We begin with an overview of the public dedication doctrine to provide context for our discussion.
            Land is dedicated to a public purpose when "the landowner's intent to do so is clear and unequivocal, and when the public accepts such use by actually using the land" for that public purpose.  In Smith v. Westfield, 478 Mass. 49, 63 (2017), a case involving the use of land owned by the city, the Supreme Judicial Court observed:  "[T]he consequence of a dedication is that '[t]he general public for whose benefit a use in the land was established . . . obtains an interest in the land in the nature of an easement,' . . . and 'upon completion of the dedication it becomes irrevocable.'"  Id., quoting Lowell v. Boston, 322 Mass. 709, 730 (1848).
            "The question of dedication . . . is one of mixed question of law and fact."  Attorney Gen. v. Vineyard Grove Co., 211 Mass. 596, 601 (1912).  We look at the totality of the circumstances to determine whether there was a clear and unequivocal intention to dedicate portions of Northeastern's property to the public.  See Smith, 478 Mass. at 64.  No formalities are necessary; a dedication need not be in writing.  Attorney Gen. v. Onset Bay Grove Ass'n, 221 Mass. 342, 348 (1915).  "The dedication 'may spring from oral declarations or statements by the dedicator, or by those authorized to act in his behalf, made to persons with whom he deals and who rely upon them; or it may consist of declarations addressed directly to the public.'"  Smith, supra at 59, quoting Onset Bay Grove Ass'n, supra.  "The owner's acts and declarations should be deliberate, unequivocal and decisive, manifesting a clear intention permanently to abandon his property to the specific public use."  Longley v. Worcester, 304 Mass. 580, 588 (1939).  Even when evidence of acceptance is extensive, the issue of whether there had been an intent to dedicate requires separate consideration.  See Onset Bay Grove Ass'n, supra at 347-348.
            Our review of the summary judgment record, in the light most favorable to the plaintiffs, leads us to conclude that no jury could reasonably find that Northeastern clearly and unequivocally intended, let alone did --  permanently dedicate the disputed area (or any portion of its property) to the public for use as an ecological preserve and for passive recreation.  The public dedication doctrine is not intended to catch an owner by surprise.  As noted, our cases make clear that "[t]he owner's acts and declarations should be deliberate, unequivocal and decisive, manifesting a clear intention permanently to abandon his property to the specific public use."  Longley, 304 Mass. at 588.  In cases where our courts have held that a private owner has made a public dedication of a park, the owner had made express promises, or shown parks on plans and then marketed and sold lots promising to keep the parks open.  See, e.g., Attorney Gen. v. Abbott, 154 Mass. 323, 324-328 (1891) (corporation showed parks on plans, conveyed lots with promise that parks would be kept forever open to public, and maintained parks until all lots were sold).  In Smith, 478 Mass. at 64, the finding that there had been a dedication was based on the acceptance of Federal funds to rehabilitate a playground with the "proviso that, by doing so, the city surrendered all ability to convert the playground to a use other than public outdoor recreation without approval."  Here, evidence of similar unequivocal acts by Northeastern is entirely absent.
            The evidence on which the plaintiffs rely to demonstrate that Northeastern clearly and unequivocally intended to dedicate the disputed area to the public is not sufficient to defeat the entry of summary judgment in favor of Northeastern.  The plaintiffs first point to the following sentence in Northeastern's proposal:  "[Northeastern] seeks to acquire the whole of East Point in order to make it a wildlife preserve."  This sentence fails to manifest the requisite intent for a number of reasons not the least of which is, as the judge noted, the sentence is taken out of context.  The sentence appears in the middle of a passage addressing the need to protect the "unusual littoral and benthonic faunas" along the shore and sea, not the dry, barren land of the disputed area.  The sentence which follows reads:  "Only in this way (creating a wildlife preserve) can the unusual littoral and benthonic faunas be protected adequately."  "Littoral" means shoreline, see White v. Hartigan, 464 Mass. 400, 407 (2013), and "benthos" means "the bottom of the sea."  Webster's Third New International Dictionary 204 (2002).  Thus, read in context, the sentence refers to the preservation of wildlife in the marine and shore areas that were to be studied at the center.  Furthermore, the remainder of the eleven-page proposal, which details various future educational and research uses and the construction of certain buildings in connection with those purposes, leaves no doubt, let alone a genuine issue of material fact, that Northeastern intended to do much more with the land.  Furthermore, even if a broader interpretation of the language were reasonable, the creation of a wildlife preserve was expressly conditioned on acquiring all of the property, which did not occur.  That the acquisition of all twenty-eight acres was important to Northeastern's plan to create a "preserve" in 1965 was further demonstrated by Northeastern's proposal to acquire the remaining eight acres when the Navy released it about a decade later.  At that time, Northeastern again represented that it planned to create a "marine wildlife preserve" if it were able to acquire control of both sites, which did not happen.[15]  Lastly, the plaintiffs ignore the fact that the proposal identifies many proposed activities, including scuba diving training, sailing, and sketching and painting instruction, but contains no mention of a public dedication of any of the land or the creation of a scenic walkway for recreational use by the town's residents or the public generally.
            Next, the plaintiffs argue that President Knowles's May 1965 letter, in which he acknowledged that Northeastern would work with the town to create a scenic walkway, establishes a dedicatory intent.  This argument is similarly unpersuasive.  To begin with, the letter refers only to a scenic pathway around the perimeter of the land and not to the disputed area.  Furthermore, Knowles promised only that Northeastern would make an effort to accommodate the town's request and did not, as the plaintiffs maintain, make any specific promise.  Indeed, it appears that neither the town nor the commission interpreted the statement as constituting a promise that the land would be dedicated to the public because, despite Knowles's assurance, the commission continued with its efforts to obtain a legal right to the scenic walkway from Northeastern and government entities.
            The plaintiffs also rely on Northeastern's description of the land on its website as evidence that Northeastern intended to permanently dedicate the area in question to the public.[16]  To be sure, for a period of time, Northeastern's website described the northeast portion of the property and the rocky coast as a wildlife sanctuary and ecological study area.  Nonetheless, reliance on the website description is untenable if only because there is no suggestion that Northeastern declared or promised that those areas would be open to the public or that it had committed to permanently dedicating them to the public.  In the end, that Northeastern described some of the area as a wildlife sanctuary brings the plaintiffs no closer to demonstrating the requisite intent by Northeastern to permanently dedicate the disputed area for public use.
            We also reject the argument that the town's treatment of much of Northeastern's land as "open space" in its planning documents and adoption of restrictive zoning for the area constitutes evidence of Northeastern's intention to dedicate the property to the use of the public.  Northeastern's intent does not turn on the town's conduct.  And, in any event, the plaintiffs have not pointed to any town document that claims an easement or other rights over Northeastern's property other than the access easement that the Federal government reserved in the 1966 deed.  Furthermore, it bears noting that under the terms of the deed, a dedication to public use -- rather than use as a marine science center -- would have had to have been approved by the Federal government during the first twenty years Northeastern owned the property.[17]  Indeed, the absence of any post-deed discussions belies the suggestion that Northeastern dedicated a portion of its property to the public.
            The plaintiffs' final argument is that the judge failed to look at the totality of the circumstances and improperly discounted the "strong, potentially dispositive, evidence" of the public's use as it bears on Northeastern's intent to dedicate the property.  In short, they ask, what else would explain the public's long-term use of the property?  The simple answer is that public use, alone, is not enough to prove a public dedication, particularly in circumstances like those present here.  See Hayden, 112 Mass. 346, 350 (1873) ("mere use[] cannot create a way by dedication").  See also Smith, 478 Mass. at 53, quoting Mahajan v. Department of Envtl. Protection, 464 Mass. 604, 618-619 (2013) (facts that Long Wharf had been identified as park in urban renewal plan and used as park for thirty years "did not reflect a specific intent to reserve that land forever as a public park but instead left open the possibility of revising the use of such open space if doing so would better accomplish the objectives of the urban renewal plan"); Onset Bay Grove Ass'n, 221 Mass. at 347-348 (even where evidence of acceptance by way of public use was ample, "whether the association had dedicated the use of these lands to the public" remained open issue).  As we have discussed, it is clear that the commission was unsuccessful in obtaining Northeastern's agreement to grant an easement or permission to enable town citizens to have access to the walkway along the shore during negotiations when Northeastern purchased the property.  In hindsight, the town's 1964 decision to forego purchasing the property may have been short sighted.  However, the mere fact that some members of the public have used the property and continue to do so has little bearing on the question of Northeastern's intent.
            Lastly, the idea that public dedication can be inferred from mere use is made even more tenuous by the fact that the land at issue is registered.  We can assume that Northeastern understood that no easement could be acquired by prescription, see G. L. c. 185, § 53, and therefore it ran no risk of losing the land by permitting the public to use it.  With that protection, and secure in the knowledge that it had not reached an agreement with the town to grant formal access or otherwise made a dedication, Northeastern may have been willing to allow passive use of portions of its property.  On this record, a jury could not find that more was intended.[18]
            For many of the same reasons we have discussed, summary judgment also was properly granted in favor of Northeastern on the town's claim of promissory estoppel.[19]  The claim rests on the town's assertion that it created various open space plans and made zoning changes in reliance on Northeastern's historical uses of the property.  The town also asserts that it would not have made these changes if it had known that Northeastern would expand the center in the manner proposed.
            "A promissory estoppel claim 'is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration.'"  Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 579, 585 (2024), quoting Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 850 (1995).  "An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation" (citation omitted).  Rhode Island Hosp. Trust Nat'l Bank, supra at 848.  See Malden Police Patrolman's Ass'n, 92 Mass. App. Ct. at 60 ("In the absence of a contract in fact, promissory estoppel implies a contract in law where there is proof of an unambiguous promise coupled with detrimental reliance by the promise.")
            Here, the town has failed to show that Northeastern made a promise in the contractual sense to preserve a portion of its land as a wildlife preserve or open space.  The town relies again on the assurance provided by President Knowles in his May 1965 letter that Northeastern would assist in developing a walkway along the shoreline in support of its claim.  But that assurance did not amount to an unambiguous promise.  It reflects no more than a future intention and is therefore not sufficient.  "It is a settled principle of contract law that '[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract.'"  Rhode Island Hosp. Trust Nat'l Bank, supra, quoting Kuzmeskus v. Pickup Motor Co., 330 Mass. 490, 493 (1953).  Furthermore, to the extent the town was under the impression that Northeastern was committed to preserving open space and made certain decisions based on that impression, that impression does not permit an inference, let alone a conclusion, that Northeastern made a promise to the town or that Northeastern knowingly influenced the town's decisions.  Additionally, while it is clear that the town, particularly the chair and members of the commission, were hopeful to reach an agreement with Northeastern, hope does not suffice in the circumstances.  See Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 442-443 (1992) (alleged promise by bank that it would fund interest payments was merely hope or expectation on part of defendants, which is not equivalent of either legal detriment or reliance.)
            Conclusion.  Based on the record facts, viewed in the light most favorable to the plaintiffs, Northeastern is entitled to summary judgment as a matter of law on all claims.
Judgments affirmed.
 
footnotes

 
            [1] Christian Bauta, Tess Bauta, Elizabeth K. Berman, Anne Bromer, Candace Cahill, Michelle Capano, Alice Cort, Mark Cullinan, Carl Jenkins, Marilyn Mahoney, William Mahoney, Dan McMackin, Diane Monteith, Andrea Murphy, Jeffrey Musman, Patrick O'Reily, Marie Elizabeth Pasinski, Roger Pasinski, Vi Patek, Linda Pivacek, Emily Potts, Laura Poulin, Peter Rogal, Peggy Silva, Susan Solomon, Paul Spirn, Donna Steinberg, Jim Walsh, and the town of Nahant, intervener.
            [2] Northeastern University vs. Nahant Preservation Trust, Inc., & others.
            [3] We refer throughout to the parties in the capacities in which they appear in the lead case filed in the Superior Court.
            [4] The twenty-eight citizens of the town have joined NPT's brief and make no separate arguments.  We therefore refer to them and NPT collectively as NPT.  The town submitted its own brief.
            [5] We note as well that the parties rely heavily on such evidence.
            [6] When called upon to speak, Alexander stated:  "I am sure that all the townspeople in Nahant wish that this area could be left, but we are all afraid of what would happen if [the property] is left for us to own and then all of Boston, Somerville, Chelsea, etc. occupy it because we would leave this wide open to the world as the Advisory Committee has told us."  Kelley expressed similar misgivings about public access:  "The second factor that really concerns us is the fact that we would have to use this park for recreational purposes.  It would have to be open to any citizen of the United States."
            [7] The area was not only barren but dangerous due to the number of "underground works," which included open manholes, thirty-five foot deep holes where the Nike missiles were stored and a "pitch dark" 1,000-foot tunnel.  As Kelly observed:  "If the town didn't make it safe, we would be liable for a very serious court action if someone is injured or hurt."
            [8] In a twist of irony, Alexander made the following prescient observation at the meeting:  "Have we given this enough thought?  I just wondered if we weren't giving up something that in a few years we'd be pretty sorry about."
            [9] The letter stated that
"[i]nsofar as conservation aspects are concerned (namely, preservation of the unusual beauty of this striking bit of unspoiled cliff-lined coastline) we are of the opinion that it is in the interest of the Town to have the property pass to an education institution such as Northeastern . . ., particularly if there were reserved to the townspeople the right to walk along a pathway on the coastal edge of the upland and if some assurance is given that only low-lying or otherwise inconspicuous buildings are contemplated."
The letter continued that "[a]t the 1965 Town Meeting the voters expressed their approval of the acquisition of the right to use a pathway over the property.  It is our belief that such a right is more likely to be obtained from the University than it would be from a developer."  Finally, the letter stated that it "seems entirely conjectural that development of the property for building purposes would be of economic benefit to the Town.  Indeed, it is speculative whether private development would be feasible."
            [10] Alexander explained that an exact description of the location would be difficult to provide, but "access to, from and over a pathway three feet (possibly two feet would be enough) wide along the perimeter of the upland adjacent to the tops of the cliffs, for the purpose of foot passage and view of the ocean, shoreline, rock structure and other scenery, would be acceptable."
            [11] The draft agreement purports to grant "inhabitants" of the town 
"the right . . . to pass on foot upon the property so acquired by [Northeastern] for the purpose of walking on the upland of the property for exercise and for viewing the cliffs, shoreline, ocean, and rock structures adjacent to the sea to the extent that such passage will not reasonably be deemed to interfere with the contemplated use of the property by [Northeastern] and the safety of its personnel, equipment and structures."
            [12] In its application, Northeastern proposed that if it acquired the additional eight acres, it would request that the entire area be designated as "a marine wildlife preserve."  However, Northeastern further explained that it intended to double the size of the center's existing laboratory, create an earth sciences research laboratory, electron microscopy facility, a boat house, living quarters for visiting scientific investigators, a corrosion studies area, a weather station, and conduct other marine-centered or educational uses.  It is apparent that much of the disputed area would have been developed had Northeastern been successful in acquiring the eight-acre parcel.
            [13] Northeastern's website stated that the "northeast portion of the property and the rocky coast are maintained as a wildlife sanctuary and ecological study area."
            [14] "Article 97 provides, among other things, that '[t]he people shall have the right to clean air and water . . . and the natural, scenic, historic, and esthetic qualities of their environment.'  It declares a 'public purpose' in 'the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources.'"  Smith v. Westfield, 478 Mass. 49, 55 (2017), quoting art. 97.  Thus, "[l]ands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, . . . of each branch of the general court."  Smith, supra, quoting art. 97.  See Carroll, 493 Mass. at 184.
            [15] The remainder of Northeastern's proposal to acquire the eight-acre parcel indicates that Northeastern planned a considerable number of improvements on the property.  Nothing on the plan indicates that Northeastern intended to preserve a meadow or similar wildlife area.
            [16] Considering the evidence in the light most favorable to the plaintiffs, we generously assume that whoever posted the information on the website had the actual or apparent authority to speak on behalf of Northeastern.
            [17] "The ordinary rule is that a written contract expresses the full purpose of the parties and cannot be amplified or narrowed by evidence as to their unstated intent."  Home Inv. Co. v. Iovieno, 243 Mass. 121, 124 (1922).  Not only did the deed fail to grant the rights the plaintiffs now seek, but the town also was not a party to the deed.
            [18] Given our conclusion regarding the lack of evidence that Northeastern either intended to dedicate the disputed area to the town for public use or did so, we need not address the question of acceptance by the town or the public.
            [19] At the hearing on Northeastern's motion for summary judgment, the town sought to reframe its claim as one alleging equitable estoppel.  The town then explicitly raised the theory of equitable estoppel in a motion to reconsider, which was denied.  The town now argues that the judge erred in not considering whether equitable estoppel applies so as to preclude Northeastern's project.  There was no error.  The town's complaint explicitly refers to promissory estoppel and, in any event, we agree with the judge that the doctrine of equitable estoppel, which applies when a party is induced to act in reliance on a representation of a past or present fact, and not a promise of future conduct, is not applicable here.  See Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 123 (1992); Boylston Dev. Group, Inc. v. 22 Boylston St. Corp, 412 Mass. 531, 542 n.17 (1992).